[No. 40519. En Banc. October 9, 1969.]

WASHINGTON NATURAL GAS COMPANY, *Appellant,* v. PUBLIC
UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY,
*Respondent.**

*Reported in 459 P.2d 633.

*Cartano, Botzer & Chapman, John W. Chapman,* and *Robert A. O'Neill,* for appellant.

*Williams & Novack,* by *Parker Williams* and *Edward D. Hansen,* for respondent.

HALE, J.—Public Utility District No. 1 of Snohomish County intends to establish underground electrical distribution systems in new housing developments. To encourage land developers to install new underground systems and to persuade householders in the new housing developments to buy electrical energy and service, the PUD offers substantial inducements. Washington Natural Gas Company, on the asserted grounds that these inducements constitute gifts and loans of money and credit in violation of the state constitution and contravene the Unfair Business Practices —Consumer Protection Act, RCW 19.86, seeks an injunction to prevent the PUD from making the offer.

Washington Natural Gas Company now appeals from a summary judgment (1) dismissing its first cause of action on the ground that the Consumer Protection Act, RCW 19.86, is inapplicable to municipal corporations; (2) dismissing the second cause of action brought under the equal protection clause of the Washington State Constitution (Const. art. 1, § 12), on the ground that plaintiff gas company is not within the class claimed to be injured and lacks standing to seek the remedy asserted; (3) dismissing the second cause of action based on Const. art. 8, § 7 for the reason that the financial inducements are not gifts but are supported by valuable consideration; and (4) dismissing plaintiff's second cause of action brought under Const. art.

8, § 7 for the reason that the financial inducements in the form of deferred payments do not constitute a lending of money or credit by a municipal corporation to a private corporation.

■ First, concerning the dismissal entered because of ostensible want of standing, we are of the opinion that the status of the gas company, solely as a customer of the PUD and one unlikely to receive the inducements it hopes to enjoin, did not give it an adequate basis upon which to claim standing. Its injuries suffered simply as a customer of the PUD would, we think, be too uncertain and nebulous to accord them justiciability. But overriding this doubtful position of mere customer and combining with it to warrant a conclusion in favor of the gas company's standing, however, is the admitted public importance of this action. Affecting as it does a substantial percentage of the population, the case is one of statewide importance. It directly involves the generation, sale and distribution of electrical energy within the state and will immediately affect the management and operation of public utility districts and other municipal corporations in this state. Additionally, a resolution of the issue here will have an indirect but, nevertheless, important consequence to agricultural, industrial, financial, commercial and labor-management activities throughout the state.

■ Where a controversy is of serious public importance and immediately affects substantial segments of the population and its outcome will have a direct bearing on the commerce, finance, labor, industry or agriculture generally, questions of standing to maintain an action should be given less rigid and more liberal answer. Therefore, when we consider the public importance of the issues presented and the direct effect their resolution will have on the people and the economy of the state and add these to the fact that plaintiff gas company is a substantial customer of the PUD, we think that the Washington Natural Gas Company can properly be said to have standing to maintain the action.

This brings us to the other conclusions given by the trial court in its summary judgment ordering dismissal. The

scheme under attack here was devised by the PUD to induce real-estate housing developers to accommodate their tracts to underground wiring and to encourage the purchase of electricity from the PUD for household purposes, largely to the exclusion of other forms of energy. Underground wiring, in the opinion of the PUD, is safer, more efficient and, of course, possesses aesthetic values lacking in conventional systems. The proposed systems would also help to bring new housing developments into conformance with standards of construction required by the Federal Housing Administration enabling them to qualify for FHA insured loans in financing the sale and purchase of houses. Federal Housing Administration financing directly benefits the PUD, for in stimulating the building and sale of housing the FHA will provide new customers for the PUD. Underground wiring provides another boon in that it aids in generating a spirit of good will within the district to be served. A majority of private and governmental organizations having to do with housing have openly advocated and educated the public to the installation of underground electric wiring systems for reasons of aesthetics, safety and efficiency.

Plaintiff, conceding that the PUD is a municipal corporation, first contends that the Consumer Protection Act (RCW 19.86), bars the kind of contracts offered ·by the PUD because, as a public utility, the PUD is exempt from state and governmental regulation. Public utility districts, under the constitution and statutes of the State of Washington, are municipal corporations. RCW 54.04.020. Plaintiff contends that, since the PUD as a municipal corporation distributes and sells electricity free from regulation by any regulatory body maintained by the state, it is in law a monopoly and in the public interest ought to be subject to the Consumer Protection Act. Since that act specifically exempts from its operation actions and transactions otherwise subject to regulation by the Washington Utilities and Transportation Commission, the Federal Power Commission, or other regulatory body of this state or the United

States, and the PUD is not regulated by any one of them, plaintiff argues that by necessary implication it was intended to come under the Consumer Protection Act.

■■ Despite the persuasiveness of this argument and the hazards to the public welfare historically apparent from business, commercial and public utility monopolies, we think that the legislature intended to exempt municipal corporations from the operation but not the benefits of the Consumer Protection Act. By its very terms, that act, RCW 19.86, includes only "natural persons, corporations, trusts, unincorporated associations and partnerships." RCW 19.86.010. Nowhere does its language imply that municipal corporations or political subdivisions of the state are within the definition of persons and entities made subject to it. Thus, the legislature did not employ language designed to bring public utility districts within the operation of the statute nor leave room to include them within it by construction. Where a statute specifically designates the things or classes of things upon which it operates, an inference arises in law that all things or classes of things omitted from it were intentionally omitted by the legislature under the maxim expressio unius est exclusio alterius—specific inclusions exclude implication. *State v. Roadhs,* 71 Wn.2d 705, 707, 430 P.2d 586 (1967).

Although the Consumer Protection Act does not designate public utility districts among the class of persons and entities subject to it, they are expressly included among its beneficiaries. The statute says that municipalities and political subdivisions are among those entities which may assert remedies provided by the statute, declaring: "For the purpose of this section 'person' shall include the counties, municipalities, and all political subdivisions of this state." RCW 19.86.090. The language of the act excluding as it does public utility districts among the classes of entities subject to it but expressly including it as one of a class protected by it means, we think, that the legislature, while affording public utility districts the protection of the statute, did not intend that they be subject to it. This view is supported by our holding in *Williamson v. Grant County Pub. Hosp. Dist.*

*1*, 65 Wn.2d 245, 251, 396 P.2d 879 (1964), where, in considering the application of the Consumer Protection Act to a public hospital district, we said:

Defendant Grant County Public Hospital District No. 1 is a municipal corporation created by state statute. Its power are vested in its duly elected officials and medical staff and regulated by statute.

RCW 19.86.170 (Consumer Protection Act) provides:

*"Nothing in this chapter shall apply to* actions or transactions otherwise permitted, prohibited or regulated under laws administered by the insurance commissioner of this state, the Washington public service commission, the federal power commission or *any other regulatory body or officer acting under statutory authority of this state or the United States. . . ."* (Italics ours.)

Hence, the Consumer Protection Act does not apply to the instant case.

Therefore, although defendant PUD is not subject to the Consumer Protection Act, it may nonetheless claim its benefits and protection.

The next question is whether the proposed contract constitutes a gift or a lending of credit or money to private persons. To answer it, we must consider the operative details of the scheme. The PUD offers to enter into a contract with land developers engaged in developing residential tracts to install at the district's expense within the tract under development a complete underground electric distribution system and an ornamental street lighting system. The developer, in exchange, however, must agree to plat the tract into a specific number of lots, restrict each site exclusively to underground service, grant necessary easements to the PUD for installing and servicing the underground system and provide payment in advance for electrical energy utilized in street lighting. Under the proffered contract, the PUD will bring the primary service lines and electricity underground to the transformer pedestal at the lot line, and the customer at the outset will be responsible for extending the wires underground from the pedestal to the residence. In other words, the developer or his pur-

chaser must install the secondary service line from the pedestal to the house.

The proposed contract does offer substantial financial inducements to the land developer not only to put the wiring underground but to make the houses "total electric"—that is, houses which use PUD electricity for all household fuel energy except fireplace fuel. The developer agrees in the offered contract to pay $225 per lot to the PUD within 3 years of the date of the agreement with interest at 6 per cent on the unpaid balance. He need not, under the proposed contract, make this payment in cash, however, for if he erects on the lot a total electric dwelling within the 3-year period, the PUD promises to allow the developer a $150 credit or payment on this $225 contractual amount. There is another financial inducement in the contract. If the residence is made total electric,[1] the PUD promises to buy the secondary service—from pedestal to dwelling—from the ultimate house purchaser at the price of $125, but will pay only $25 for it if the residence is not total electric.

Under the contract, the PUD acquires a lien against the realty for all unpaid amounts due it under the contract. When the PUD pays for the secondary service, it becomes owner of both the primary and secondary service system. The contract also assures the PUD of the sale of electricity for street lighting within the development which lighting will be substantially paid for in advance.

Plaintiff gas company, contending that these undertakings and promises amount to gifts and the lending of money and credit to the land developer and the ultimate purchaser, invokes Const. art. 8, § 7, which states:

> No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, associa-

---

[1] A "total electric" dwelling is defined in paragraph 7A of the contract as a residence "designed, constructed, and equipped for the use of electric power for all energy required for lighting, cooking, appliances, hot water heating, air conditioning, and a minimum of 10 KW space heating, to the exclusion of other types of fuels, excepting only wood burning fireplaces."

tion, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.

■■ We agree with plaintiff that article 8, section 7, prohibiting any city, county, town, or other municipal corporation from giving away its money or property or lending its money or credit to or in aid of any private entity is a mandatory provision and must be strictly observed. *Johns v. Wadsworth,* 80 Wash. 352, 141 P. 892 (1914); *State ex rel. Washington Nav. Co. v. Pierce County,* 184 Wash. 414, 51 P.2d 407 (1935). *State ex rel. O'Connell v. Port of Seattle,* 65 Wn.2d 801, 399 P.2d 623 (1965), cited by plaintiff, acknowledges it as a mandatory principle but does not, we think, prohibit the proffered contracts either as gifts or the lending of money or credit to the land developer and his subsequent purchaser for value. In that case, we held that the furnishing of meals and refreshments by a port district to private individuals who might possibly promote the shipping business or in the future transact business with the port district was in fact a gift of public money and property to private persons and, therefore, an unconstitutional expenditure of public funds. So-called "promotional hosting," that is, the spending of public money to supply food and entertainment for shippers, influential businessmen and other private individuals, amounted to gifts to them and was, we said, forbidden under Const. art. 8, § 7. The possible benefits accruing to the port district in the future seemed so illusory and doubtful that we concluded the guests delivered no adequate consideration in exchange for the port's bounty. Among the features which distinguish *State ex rel. O'Connell v. Port of Seattle, supra,* from this one was the lack of a contract or agreement binding recipients of the refreshments to do any business whatever with or render any specific service or benefit to the port district. The refreshments and entertainment were on their face gifts made with only the most illusory possibility of a benefit to the port. The want of a beneficial contract and the lack of genuine mutuality between host and guest

thus proved constitutionally fatal to the arrangements. That case, we think, has no controlling effect here except to buttress the mandatory nature of the constitutional provision.

We see a marked difference also between the instant circumstances and those in the cited case of *State ex rel. Washington Nav. Co. v. Pierce County*, 184 Wash. 414, 51 P.2d 407 (1953). There the county had sold and delivered to the Washington Navigation Company its ferries "City of Tacoma" and "Gig Harbor" for a price of some $65,000, retaining no ownership nor proprietary interest in either vessel. The county then contracted to let the navigation company operate the ferries, keep all fares less 5 per cent, and agreed to pay to the navigation company a substantial monthly subsidy for operating the ferries. We declared the subsidy arrangement void and illegal as a gift of the county's money and property to a private corporation.

In the *Washington Nav. Co.* case, the county retained no ownership or interest in the ferries which it had sold. The county had parted with the ferry boats, transferring all title and ownership to the navigation company so that the ferry boats became the property of a private corporation. In the instant case, however, the PUD becomes the sole and exclusive owner of the transmission lines; private parties retain no interest in them except whatever ownership might be said to accrue through ownership of the servient estate over which the PUD acquires an easement. In acquiring ownership of the underground system, the PUD demonstrates but one of several features in the performance of the contract which distinguish it from the *Washington Nav. Co.* case.

In *Johns v. Wadsworth*, 80 Wash. 352, 141 P. 892 (1914), this court said that the constitution prohibited even minor gifts from which the public might benefit indirectly. That case precluded Pierce County from appropriating money to contribute to the Fair Association of Western Washington, a private corporation which annually put on a regional fair, even though it was known that the fair would be widely

attended. On the fact of it, there was little doubt that the appropriation would constitute a gift.

We would adhere to all of these precedents now on the question of gifts but find none of them to be controlling. Not only is there an abundance of consideration moving directly to the PUD in the instant case to support its offer of a contract, but there will be an actual delivery of property and acquisition of ownership by the PUD in addition to the sale of electricity which will be made under the contract. The contracts, therefore, do not constitute offers of gifts.

Concerning the perhaps more subtle question of loans of money and credit, *Berglund v. Tacoma,* 70 Wn.2d 475, 423 P.2d 922 (1967), is a case which we think does support the constitutionality of the proffered contracts. There we said that a guaranty fund established from the city's general fund to guarantee warrants issued in financing an out-of-city LID water system extension did not violate Const. art. 8, § 7, as an illegal loan of municipal money or credit where the city would, within a reasonable period of time, become the sole owner of the water system extension. Similarly, in the instant case, the PUD becomes the owner of the primary system and, on payment to the householder, of the secondary system as well—thus acquiring ownership under the contract of both primary and secondary services and an easement for each installation. In exchange for allowing the $150 credit to the developer and other consideration, the PUD will, as a measurable benefit, acquire a substantial number of total electric customers who will purchase from it greater amounts of electrical energy than ordinary customers. It will be assured of paid-in-advance 5-year sales of electricity for street lighting, and derive financial benefit from the developer's work and expenditures in helping install each secondary system and the street lights.

Thus, even though the developer will be allowed 3 years in which to earn the $150 credit, he not only pays a reasonable interest of 6 per cent on the unpaid balance, but actually delivers over to the PUD a substantial property in consideration of the agreement. There is, therefore, no

lending of money or credit for permitting deferment of the payment, but rather a genuine exchange of concrete, specific, measurable consideration.

As long as a municipality or governmental body treats all of its customers alike, makes reasonable classifications of its customers, and accords equal treatment to all who come within a particular class, constitutional prohibitions against loans of credit, property or money do not mean that the municipal corporations must be paid instanter for every unit of energy delivered. The constitution does not prohibit efficient business practices nor bar efficient service. Were it otherwise, one would have to pay his light and water bill every day lest it be said that he was the recipient of the municipality's loan of credit for the next 24 hours. The municipality, we think, may, consistent with efficient management, sell and deliver electrical energy to its citizens and customers on short term credit as long as this procedure does not allow the customer to convert this concession into a profitable hypothecation of credit with third persons.

We think a municipal corporation may similarly deal with its customers in installing and building the system for transmitting the energy. Allowing the developer a reasonable period of time in which to develop his project, sell his houses, persuade his buyers to accept *all electric houses*—during which time he pays reasonable interest on the $225 indebtedness per unit—is not, we think, a lending of credit or money by the PUD.

Affirmed.

ALL CONCUR.