980 P.2d 1234 (1999)
138 Wash.2d 561
LANDMARK DEVELOPMENT, INC., a Washington corporation, Petitioner,
v.
CITY OF ROY, a municipal corporation; Charles L. Wolf and Jane Doe Wolf, husband and wife; James Rotondo and Jane Doe Rotondo, husband and wife; Joe Derefield and Jane Doe Derefield, husband and wife; Rex Raczykowski and Jane Doe Raczykowski, husband and wife; James Byrd and Jane Doe Byrd, husband and wife; and Patrick Sloppy and Jane Doe Sloppy, husband and wife, Respondents.
No. 65817-0.
Supreme Court of Washington, En Banc.
Argued May 19, 1998.
Decided July 22, 1999.
*1235 Gordon, Thomas, Honeywell, Salvador A. Mungia, II, Margaret Archer, Tacoma, for Petitioner.
Ogden, Ogden & Wallace, Phillip C. Raymond, Kent C. Metey, Seattle, for Respondents.
JOHNSON, J.
This case requires us to decide whether a municipality, in setting and applying water connection charges authorized under RCW 35.92.025, is liable to a developer for damages under RCW 64.40.020(1), RCW 35.92.010, or 42 U.S.C. § 1983 and § 1988. Specifically, we must resolve whether a municipality, in determining its water system users' equitable share of the system's cost via the computation of water charges authorized under RCW 35.92.025, must deduct grants and donations used for improving the water system. We are also asked to decide whether a municipality may charge a different connection fee to two similarly situated developers. The Court of Appeals reversed the trial court's judgment in favor of the property owner. Landmark Dev., Inc. v. City of Roy, No. 19797-9-II, 1997 WL 235500 (Wash.Ct.App. May 9, 1997). We affirm.

FACTS
In early July 1990, Landmark Development, Inc. (Landmark) requested a water availability letter from the city of Roy (Roy), a city of approximately 350 people in Pierce County. In compliance with county platting procedures, Landmark sought tentative assurance from Roy that sufficient water was available for Landmark's proposed 50-unit residential development to be built outside the Roy city limits.
On July 9, 1990, Mark Carpenter, a principal of Landmark, assured the Roy City Council (Council) that Landmark's inquiry, as a preliminary step in the developer's rudimentary plans, was limited to the issue of water availability alone: "[A]t this point, [the Landmark development] is all conjecture and so what I'm just looking for is a letter stating that you do have water that is available to tap on to this and, you know, so that I can go ahead and submit and go from there." Roy City Council Hr'g Tr., July 9, 1990 at 2 (Pl.'s ex. 1, at 2) (hereinafter Transcript). The Council attempted to secure more detailed information about the planned development at this meeting but Carpenter was unable to provide specific facts for the Council to rely on: "I wish I had more stuff, but, you know, until we get it back from the County and they tell us things we can and can't do, its hard to pin it all down." Transcript at 3.
Indeed, at this meeting, Landmark expressly stated that its inquiry was not about what Roy's water might cost the developer. *1236 Rather, Landmark was solely seeking assurance that Roy's water quantity was sufficient if Landmark's development plans came to fruition. When Roy Mayor Charles L. Wolf cautioned Landmark that the development project "will be at your expense," Landmark replied: "Right. But ... they don't want to know about that. All they care about is that there is water available." Transcript at 7. Based on these representations of Landmark's interests, Roy shortly after the meeting issued Landmark a standard water availability letter and certificate of water availability on July 18, 1990. Landmark signed the certificate on August 22, 1990 and returned it to Roy.
The one-year water availability letter confirmed enough water was available for the 50 new water connections Landmark might install. In conformity with the understanding that occurred at the July 9, 1990 Council meeting, the letter did not commit Roy to a fixed connection fee. Directly above Carpenter's signature, the letter reads:
I [Landmark] acknowledge that this proposed project may require improvements to the water system which would incur my financial obligation. Prior to final approval for construction of the water system, it is understood that a legal contract between myself and the water utility must be submitted which specifies the terms of water service, operational responsibility, and financial obligation.
Certificate of Water Availability (Pl.'s ex. 4, at 2).
Also, at the July 9, 1990 Council meeting, Landmark assured Roy that Landmark's on-site water connections would be "more than up and running" in six months. Transcript at 6. Roy's city attorney confirmed this understanding of Landmark's building schedule, reiterating, "we anticipate that the contract will be completed sometime in the fall...." Transcript at 7. However, it was in fact nearly two years later, on May 13, 1992, when Landmark finally managed to purchase the proposed 30 acres of property outside Roy. Since the property purchase date occurred nearly two years after Roy's original one-year water availability letter had been issued to Landmark, that letter had expired by the time Landmark actually bought the property. On February 26, 1993, two and one half years after Landmark first made its water availability inquiries to the Council, Roy renewed the original one-year water availability letter to Landmark.
During this time, another developer, New Concept Homes, Inc. (New Concept), requested a water availability letter from Roy for a planned 83-unit residential development also located outside of Roy. Roy issued a one-year water availability letter to New Concept on October 19, 1992; that letter was identical to the one issued to Landmark.
In 1986, Roy had constructed a 260,000-GALLON standpipe and two 500-gpm wells. That expansion of the city's water supply cost $177,669 and the expansion of the city's water storage capacity cost $269,923. The total cost of the 1986 construction was $447,592. A part of the cost was funded by a federal grant. Roy borrowed $70,000 to pay those expansion costs not borne by the federal monies.
Both the Landmark and New Concept developments would be utilizing Roy's water system as it existed after the 1986 expansion project. The new developments would add an additional 133 service connections to Roy's existing draws. Roy would also need to provide required fire flows to the proposed development plats.
At the time Roy sent the 1992 water availability letters to Landmark and New Concept, Roy's water connection fee was set at $350 under Roy City Ordinance 351. In July 1993, New Concept finished installing its water system at its development site and was ready to connect to Roy's water system.
After Roy was informed by New Concept in June that its development units would be ready in less than one month to connect to the municipal water system, Roy issued a connection fee invoice to the developer. This bill, dated June 15, 1993, charged New Concept $350 per connection, the city fee then in effect. New Concept paid this invoice on October 21, 1993.
Meanwhile, by June 1993, Landmark was still one and one half years away from commencing installation of the water system at *1237 its development site. Landmark had not moved beyond the initial stage in the negotiation process  Roy's water availability letter. That letter, as noted above, contained no language guaranteeing Landmark a specific water connection fee.
After New Concept was connected to the Roy water system and had received its invoice, Roy learned that a project report was required by the state Department of Health as a supplement to Roy's 1982 comprehensive water system plan and engineering report. On July 9, 1993, nearly one month after issuing its water connection rate invoice to New Concept, Roy contracted with a professional engineering firm, Gray & Osborne, to prepare the mandatory project report. Gray & Osborne's report was to "evaluate[ ] the proposed developments' impacts on the City water system using hydraulic modeling." Gray & Osborne Report at 1-1 (Pl.'s ex. 33) (hereinafter Report).
Gray & Osborne recommended, inter alia, "that the City consider increasing their installation and connection charges outside the City limits to provide a source of funding for capital improvements which will be necessary to meet the requirements of the expanded service area." Report at 1-3.
Specifically, Gray & Osborne advised Roy increase its $350-per-unit connection fee to $920. Gray & Osborne had taken the total cost of Roy's 1986 expansion ($447,592) into account when calculating its recommended connection fee increase: "The connection charge for the City of Roy was determined using the 1986 construction cost of the 260,000-gallon standpipe and two 500-gpm wells, and dividing these costs by the number of equivalent residential units (ERUs) each facility has the capability of serving." Report at app. F.
Roy followed Gray & Osborne's recommendation and adopted Roy City Ordinance 448 at its October 11, 1993 Council meeting, raising the water connection fee to $920 per connection. At a September 21, 1993 Council meeting, a month before Ordinance 448 was passed, Landmark tendered a check to Roy for $17,500 which would have paid in full Landmark's planned connections at Roy's old water connection fee rate. However, at the time Landmark tendered the check, the developer had not begun design or construction of its water system and could not estimate when it might do so. In fact, Landmark was over one month away from even submitting its water system plans to Roy. Roy, therefore, rejected Landmark's check. Although initially cautious at this meeting, Roy's city attorney later conducted legal research and advised Roy to charge Landmark the new connection fee.
Landmark brought suit in December 1993, alleging Roy was charging it an unreasonable water connection fee. Landmark specifically alleged Roy had breached its contract with Landmark, violated Landmark's equal protection rights, acted arbitrarily and capriciously, and denied Landmark its substantive and procedural due process rights under both the federal and state constitutions. Landmark requested injunctive relief and over $600,000 in lost profits, attorney fees, and costs. Following a trial, the superior court found in favor of Landmark on four grounds, ultimately awarding it approximately $125,000 in damages, attorney fees, and costs. Roy timely appealed. The Court of Appeals reversed the trial court judgment on all grounds in an unpublished opinion. Landmark Dev., Inc. v. City of Roy, No. 19797-9-II, 1997 WL 235500 (Wash.Ct.App. May 9, 1997). The Court of Appeals further denied both parties' requests for attorney fees. We granted Landmark's appeal.

ANALYSIS

I.
Did the Court of Appeals, by interpreting state law to allow a municipality to base water connection fees on something more than the cost of the water system in municipal dollars alone, err in its reversal of the trial court's judgment for Landmark?
The trial court awarded Landmark damages under RCW 64.40.020(1), essentially concluding that Roy acted unlawfully in calculating its new water connection fee as authorized under RCW 35.92.025. Landmark contends that the statute requires a municipality, when calculating water connection *1238 fees, to deduct any grants and donations it uses in the funding of its water system. RCW 64.40.020(1) provides:
Owners of a property interest who have filed an application for a permit have an action for damages to obtain relief from acts of an agency which are arbitrary, capricious, unlawful, or exceed lawful authority, or relief from a failure to act within time limits established by law: PROVIDED, That the action is unlawful or in excess of lawful authority only if the final decision of the agency was made with knowledge of its unlawfulness or that it was in excess of lawful authority, or it should reasonably have been known to have been unlawful or in excess of lawful authority.
In order to resolve Landmark's RCW 64.40.020(1) claim, we must first decide what RCW 35.92.025 requires of municipalities. That statute reads in part:
Cities and towns are authorized to charge property owners seeking to connect to the water or sewerage system of the city or town as a condition to granting the right to so connect, in addition to the cost of such connection, such reasonable connection charge as the legislative body of the city or town shall determine proper in order that such property owners shall bear their equitable share of the cost of such system.
Statutory interpretation is a legal question which we review de novo. Dioxin/Organochlorine Ctr. v. Pollution Control Hearings Bd., 131 Wash.2d 345, 352, 932 P.2d 158 (1997). RCW 35.92.025 authorizes municipalities to require property owners pay a fee to the city or town in order to connect to its water or sewage system. The statute allows the city or town to set the fee so that all system users pay their equitable share of the cost of such system. The statute does not expressly require that federal grant monies be deducted when the city calculates each user's equitable share. RCW 35.92.025 requires only that connection fees be computed based on the cost of the system. The statute is silent on the matter of the system's funding sources.
Since the Legislature, in drafting RCW 35.92.025, did not expressly require funding sources be factored into a city's computation, we must decide whether such a requirement is implied. We hold it is not. In reaching this determination, we find review of related statutes helpful.
There are four types of municipal corporations in Washington engaged in water purveying and/or sewer service. There are special purpose municipal sewer and water districts, covered in RCW Title 56 and RCW Title 57, respectively. In 1997, these distinct districts were combined into single water-sewer districts. Laws of 1996, ch. 230 (effective July 1, 1997). Municipal utilities, such as Roy where the water purveyor is a department of the city government, are covered in RCW 35.92. Finally, there is a fourth type of municipal corporation, known as a metropolitan municipal corporation, covered by RCW 35.58.
In 1989, the Legislature amended various utility statutes and added new chapters to Title 56 and Title 57 regarding "water and sewer connection and capacity charges." Laws of 1989, ch. 389. We shall now consider several sections of chapter 389, Laws of 1989 that are relevant to the resolution of Landmark's claim.
Section one of chapter 389 added a new section to RCW 35.58. The new section addressed sewage connection and capacity charges for metropolitan municipal corporations. Section one does not state that a metropolitan municipal corporation must offset grants or donations when calculating connection charges for incoming system users.
Section two of chapter 389 addressed capacity charges for sewer districts. It added the following language to section one, chapter 449, Laws of 1987 and RCW 56.08.010:[1] "The cost of existing facilities shall not include those portions of the system which *1239 have been donated or which have been paid for by grants."
Section nine of chapter 389 addressed capacity charges for water districts. It added the following language to section one, chapter 11, Laws of 1988 and RCW 57.08.010:[2] "The cost of existing facilities shall not include those portions of the system which have been donated or which have been paid for by grants."
Thus, in 1989, in a single piece of legislation, the Legislature specifically provided direction whether water purveyors are mandated to deduct donations and grants from the costs of water and sewer systems for the purpose of calculating user connection charges. The Legislature, sub silentio, allowed the inclusion of donations and grants in the calculation method of metropolitan municipal corporations. At the same time, the Legislature expressly required the deduction of donations and grants in the calculation methods of water and sewer districts. The Legislature specifically did not amend, via Laws of 1989, chapter 389, the statutory scheme for municipal utility corporations such as Roy.
In the language of chapter 389 we have, therefore, a most persuasive application of the judicial doctrine expressio unius est exclusio alterius: the expression of one is the exclusion of the other. "Legislative inclusion of certain items in a category implies that other items in that category are intended to be excluded." Bour v. Johnson, 122 Wash.2d 829, 836, 864 P.2d 380 (1993). "Where a statute specifically designates the things or classes of things upon which it operates, an inference arises in law that all things or classes of things omitted from it were intentionally omitted by the legislature under the maxim expressio unius est exclusio alterius  specific inclusions exclude implication." Washington Natural Gas Co. v. Public Util. Dist. No. 1, 77 Wash.2d 94, 98, 459 P.2d 633 (1969).
The Legislature in 1989 considered the matter of how connection fees should be calculated for three of the four municipal corporations in Washington that purvey water and sewer services. In drafting chapter 389, Laws of 1989, the Legislature resolved that donations and grants must be deducted by water and sewer districts, but not by metro districts. The Legislature further decided not to alter the statutory scheme for municipal districts such as Roy. Adopting the doctrine that the expression of one is the exclusion of the other as the statutory tool to interpret the Legislature's intent in drafting chapter 389, the inclusion or expression of the three types of water corporations in the legislation adds forceful argument to an interpretation that the Legislature's exclusion of the remaining fourth type of corporation, municipal utility corporations, was intentional. If, under chapter 389, Laws of 1989, the Legislature had wanted to include municipal water utilities in its new mandate requiring water and sewer districts deduct donations and grants as offsets, the Legislature would have done so.
The Legislature's intent is unmistakable under the expressio unius est exclusio alterius rule of statutory construction: the Legislature does not require municipal utilities such as Roy to identify donations and grants as offsets. No matter how equitable it may initially appear to consider donations and grants as offsets, we cannot do so without ignoring the clear intent of the Legislature as evidenced in the 1989 legislation.
This interpretation is also consistent with the overall statutory purpose undergirding the Legislature's authorization of this type of fee. Such fees are not, as Landmark's interpretation would imply, cost recovery mechanisms for utility purveyors. If this faulty interpretation was correct, it could be argued that whenever a system's costs were fully recovered through connection fees any future system users would be statutorily entitled to hook up to the "paid off" utility system for free.
Instead, these statutorily authorized fees provide the means by which a purveyor may equitably allocate to new users access to an existing system possessing an existing value. In addition, the fees become a resource through which the utility purveyor may fund *1240 necessary capital improvements to the utility system.
We, therefore, conclude that, under the Legislature's scheme for the computation of water system connection fees as demonstrated in RCW 35.92.025, grants are not deducted. Consequently, Roy acted properly and legally in computing its water connection costs and did not violate RCW 64.40.020(1).

II.
Did the Court of Appeals err by interpreting state law to allow a municipality to charge a different fee to water users within the same class, thereby reversing the trial court's judgment in favor of Landmark?
Landmark essentially argues a municipality acts arbitrary and capriciously under RCW 64.40.020(1) if it charges different fees to two similarly situated water users. We need not reach the issue of whether a municipality, in contracting for different water connection charges to similarly situated users, violates RCW 64.40.020(1) because we conclude, as did the Court of Appeals, that the evidence before the trial court did not support the conclusion that Landmark and New Concept were similarly situated.
Arbitrary and capricious action is "`wilful and unreasonable action, without consideration and regard for facts or circumstances.' " Teter v. Clark County, 104 Wash.2d 227, 237, 704 P.2d 1171 (1985) (quoting Miller v. City of Tacoma, 61 Wash.2d 374, 390, 378 P.2d 464 (1963)). "Where there is room for two opinions, action is not arbitrary or capricious when exercised honestly and upon due consideration...." DuPontFort Lewis Sch. Dist. No. 7 v. Bruno, 79 Wash.2d 736, 739, 489 P.2d 171 (1971).
The standard of review for a trial court's findings of fact and conclusions of law is a two-step process. First, we must determine if the trial court's findings of fact were supported by substantial evidence in the record. If so, we must next decide whether those findings of fact support the trial court's conclusions of law. Willener v. Sweeting, 107 Wash.2d 388, 393, 730 P.2d 45 (1986).
The trial court concluded that Landmark and New Concept were similarly situated developers and Roy acted arbitrarily and capriciously when it charged Landmark a higher fee than New Concept. We hold the record in this case does not support this conclusion.
The record establishes that New Concept began installing its water system in June 1993, and completed installation in July 1993. On June 15, 1993, New Concept was invoiced for its water connection charges at $350 per connection, the amount established under the existing ordinance.
Near this time, Roy learned it needed to file the mandatory updated project report with the state. On July 9, 1993, Roy commissioned Gray & Osborne to compile this report. The report presented to the Council in September 1993 contained a recommendation that the water connection fees be increased to $920 per connection. Based on this advice, on October 11, 1993 Roy adopted Ordinance 448, raising the municipal water connection fee to $920 per connection. At this time, Landmark had not progressed beyond the preliminary negotiation stage in its dealings with Roy. Landmark was in possession of Roy's renewed water availability letter; however, that letter contained no details about the terms, including the fee rate, for using the municipality's water system.
Further, the record establishes Landmark had not yet even begun construction at its development site. Landmark, at the September 1993 Council meeting debating the fee increase, had still not submitted its water system plans to Roy nor had Landmark any idea when it would be ready to hook up to Roy's water system. Ultimately, Landmark's system was neither approved nor installed until January 1995.
We find that while Landmark and New Concept were both nonresident developers requesting Roy supply water to their development sites, they were not identical members of a designated class. This is so primarily because of the discrepancy in their construction statuses within the time frame of factual events. New Concept was ready to hook up to Roy's water system when the connection fee was $350 and, following Roy's *1241 practice of billing at the time of hook-up, was invoiced accordingly. After that invoice was issued, Roy learned it needed to commission an engineering report. Gray & Osborne then issued the mandatory report, recommending Roy adopt an enhanced water connection fee. Roy, once made aware by Gray & Osborne what Roy's municipal water connection fee should be, adopted the new connection charge. Since Landmark was still not ready to hook up to Roy's water system, the developer was informed that once Landmark completed design and installation of its on-site water system it would be invoiced for water connections at the new rate.
We conclude, based on the record, that Roy possessed a rational basis for its different treatment of the two developers and its actions were not arbitrary and capricious. Since Landmark and New Concept were not similarly situated developers and there was no vested right at issue, we do not reach the matter of when, if ever, a municipality may treat similarly situated parties disparately.[3]
Finally, Landmark advances two subsidiary claims. First, Landmark contends that Roy's ongoing treatment and negotiation with Landmark caused unnecessary delays and the stalling of Landmark's residential building schedule. However, from the onset of the Roy/Landmark transactions there is sufficient evidence in the record of Landmark's admitted own lack of certainty and efficiency when it came to its building plans and schedule. Since these selfimposed delays plagued the Landmark project from its outset, any alleged delays by Roy were inconsequential. This claim is denied.
Second, Landmark also claims Roy violated RCW 35.92.010, a statute mandating that users within the same class be charged the same rate. RCW 35.92.010 is a statute concerning the adoption of long term, ongoing water rates. Here we are confronted with the methodology for calculating one time municipal water connection fees or charges. Landmark's reliance on RCW 35.92.010 is in error and we, therefore, deny this claim as well.
In sum, we hold Roy's action in applying Ordinance 448 to Landmark was not arbitrary and capricious and did not violate RCW 64.40.020(1). We dismiss Landmark's related claims of disputatious negotiation conditions.

III.
The trial court ruled that Landmark's federal constitutional rights of due process and equal protection were violated and, under 42 U.S.C. § 1983 and § 1988, Landmark was entitled to damages, attorney fees, and costs. Landmark's remedial request is that those awards be reinstated. Since we do not find Roy violated RCW 64.40.020(1), Landmark's 42 U.S.C. claim need not be addressed and its companion award reinstatement request is, therefore, denied.[4]
GUY, C.J., and DURHAM, SMITH and TALMADGE, JJ., concur.
ALEXANDER, J. (concurring in part)
I agree with Justice Sanders that the City of Roy violated RCW 35.92.025 when it failed to deduct federal grant money before calculating the water connection fee it charged Landmark. To offset what would otherwise be a windfall to Roy, the fee charged to Landmark should be recalculated. I do not, however, agree with Justice Sanders that the trial court was correct in concluding that Roy acted arbitrarily and capriciously in charging Landmark a different fee than it charged another developer, New Concept. Although Roy, in my view, incorrectly computed the fee charged to Landmark, I cannot conclude that its action was unreasoning. It did not, therefore, violate RCW 64.40.020(1).
*1242 SANDERS, J. (dissenting)
The majority construes a statutory mandate that costs be "equitabl[y] share[d]"[1] to mean municipalities are entitled to collect twice for the construction of the same water system: once from a federal grant, and once again from the property owners. Compounding its error the majority then ignores trial court factual findings that Roy arbitrarily discriminated against Landmark vis-a-vis a similarly situated developer, New Concept. Landmark is entitled to relief on both grounds and the trial court should be affirmed.
A. Equitable sharing of costs must account for federal grant.
Cities "are authorized to charge property owners seeking to connect to [their] water or sewerage system ... such reasonable connection charge ... in order that such property owners shall bear their equitable share of the cost of such system." RCW 35.92.025. Roy based its connection charge to Landmark on a capital improvement cost of $447,592 divided by the estimated number of residential units that could be served. Def.'s Ex. 33, at App. F. The formula makes sense but for the fact the federal government had already paid the lion's share of this cost (84.4 percent), through a nonrefundable grant. Nevertheless, Roy did not credit the federal grant against the total cost of the system (Clerk's Papers (CP) at 340 (Finding 30)), preferring instead to reap a windfall at the expense of the property owners by nearly doubling its cost recovery.
Imposing the entire undivided cost of the system on the shoulders of the property owners without first crediting the share paid by federal grant moneys was neither "reasonable" nor "equitable" under the statute because the city was no longer simply recovering the cost of the system but raising money for other purposes. See Margola Assocs. v. City of Seattle, 121 Wash.2d 625, 638, 854 P.2d 23 (1993) (when revenues generated greatly exceed the proper regulatory costs, they are fiscal rather than regulatory); King County Fire Protection Dist. v. Housing Auth., 123 Wash.2d 819, 833, 872 P.2d 516 (1994) (charges that primarily raise money are taxes). Not only did the scheme violate the statute on its face but in effect allowed the city to impose a special tax on a subclass of real property, on a basis other than value, contrary to constitutional guarantees mandating uniformity and ad valorem taxation. Const. art. VII, § 1 (amend.81).
This statute authorizes only those connection fees which equitably share water system capital costs. RCW 35.92.025. We should give this statutory language its plain, ordinary meaning as defined by a dictionary. State v. Bolar, 129 Wash.2d 361, 366, 917 P.2d 125 (1996). "Share" means "to divide and distribute in portions." Webster's Third New International Dictionary 2087 (1981). Therefore sharing costs first requires a calculation of the total cost and then a division of that cost amongst those who pay it.
The majority's fallacy is that it ignores the federal government has already paid an 84.4 percent share of the water system cost, leaving only 15.6 percent of the total cost to be equitably divided among the property owners. The majority's result means all shares combined may exceed 184 percent of the total. This is not division; it is multiplication. It is mischief.
*1243 The first principle of statutory construction is if a statute is plain and unambiguous its meaning must be derived from the language of the statute itself. Harmon v. Department of Soc. & Health Servs., 134 Wash.2d 523, 530, 951 P.2d 770 (1998). As we held in Boe v. City of Seattle, 66 Wash.2d 152, 401 P.2d 648 (1965), the mandate of this statute is indeed unambiguous. In Boe the City of Seattle charged a user connection fee not calculated on the actual municipal cost to construct the system but rather on "`present construction costs which have increased 161% since the time that the trunk sewer was constructed....'" Id. at 156, 401 P.2d 648 (quoting the adopted trial court memorandum decision of Walterskirchen, J. (9/23/63)).
We concluded this approach which would have allowed the city to recover more than the actual cost of the system clearly exceeded the city's statutory authority. We therefore rejected Seattle's argument that its fee was "reasonable" because "`[t]his ... overlooks the fundamental basis on which the fee is to be calculated, which is not that of the benefit received but merely an equitable sharing of the cost of the system.'" Id.[2] The "cost of the system" is the cost to construct it. The "cost" is not greater because the benefits are greater. Nor is the cost greater because a source additional to property owners has been located to bear all or a portion of that cost.
The majority states the equitable sharing mandated by statute is of the "cost of the system ... [not] the system's funding sources." Majority at 1238. True enough, but sharing the cost must divide that cost into shares, not increase it to encompass all additional sources of revenue. If payments, from whatever source, exceed the total cost, the cost is no longer shared, it is exceeded. As we held in Boe, an "equitable share of the cost of such system" is a proportional division of the cost of the system between those who pay for it. Here not only the users but also the federal government pays. By fixating on "cost" the majority begs the question of how that cost is to be "shared."
Moreover the statute not only mandates the cost be "shared," but equitably so. In the absence of a statutory definition of equitable, we again repair to the dictionary. Bolar, 129 Wash.2d at 366, 917 P.2d 125. Equitable is that which is "[j]ust; conformable to the principles of justice and right." Black's Law Dictionary 537 (6th ed.1990). Something is equitable when it is "characterized by evenness." Webster's Third New International Dictionary 769 (1981). See also Central Wash. Refrigeration, Inc. v. Barbee, 133 Wash.2d 509, 517 n. 12, 946 P.2d 760 (1997) (equitable action of indemnity is based on "`one party paying more than its fair share.'") (quoting City of Willmar v. Short-Elliott-Hendrickson, Inc., 512 N.W.2d 872, 874, 49 A.L.R.5th 801 (Minn.1994)).
The fee which the majority affirms is not "equitable." It allows the City of Roy to reap a double recovery windfall of almost $380,000 by allowing the city to charge the user again for a system which was nearly paid in full by federal grant. This is inequitable because it imposes a disproportionate burden on a subclass of property beyond the net cost of the special benefit to that property. Funds raised in excess of capital cost recovery are in the nature of general revenue. They are not compensatory. Taxes levied on a subclass of real property contrary to the constitutional requirement that all real estate is a single class which must be taxed uniformly by value can hardly be "equitable." Const. art. VII, § 1 (amend.81).
Other jurisdictions are in accord that failure to offset federal grants against capital costs which may be recovered by regulatory fees is error. The Supreme Court of Utah observed that among the most important factors to be considered by a municipality when determining the equitable share of a capital cost is "the manner of financing existing capital facilities (such as user charges, special assessments, bonded indebtedness, general *1244 taxes, or federal grants.)" Banberry Dev. Corp. v. South Jordan City, 631 P.2d 899, 904 (Utah 1981) (emphasis added). See also Meglino v. Township Comm. of Eagleswood Township, 103 N.J. 144, 510 A.2d 1134, 1143 (1986) (legislative history of a statute governing utility authorities that required the deduction of federal grant money provides the "overriding principles" applicable to municipalities).
A plain reading of the statute supports the legal conclusion of the trial judge that this $920 fee violated the statute because "Roy should have subtracted the money it received from federal grants from the cost of its water system" to make the connection charge reasonable, CP at 342 (Conclusions of Law ¶ 2). The connection fee, if calculated as required by statute, must be based on an equitable division of the total cost between all sources of payment.
Incredibly the majority asserts without citation, the "overall statutory purpose undergirding the Legislature's authorization of this type of fee" is not cost recovery. Majority at 1239. To assume it is cost recovery, the majority continues, would allow the argument that future users could hook up to the "`paid off'" utility system for free. Id. However by postulating this hypothetical the majority not only ignores the plain meaning of the statutory text but assumes a scenario only possible if the fee were improperly calculated in the first place. A proper connection fee requires a connection fee calculated to recover the water system's capital cost after the planned maximum number of users has connected.[3] But for its failure to credit the federal grant, that is the method by which Roy calculated this fee. The majority's example envisions an excessive, unreasonable, and inequitable fee because it would recover the entire capital cost from the first users to connect.
Contrary to the majority's assertion, support for the proposition the legislature intended connection charges to serve as a cost recovery mechanism is also found in language mandating the removal of federal grant money in other legislation pertaining to water and sewer districts, language which the majority misreads to support its conclusion that no deduction is required here. Majority at 1238-39 (citing Laws of 1989, ch. 389, §§ 1, 2, and 9). The final bill report for that legislation noted the purpose of those connection charges is to "ensure that new customers pay a proportionate share of the capital costs of facilities to match the sum already paid by the existing customers.... The charges are usually used to retire debt incurred to finance construction." "Synopsis as EnactedBackground," Final B. Rep. SSB 6013, at 1 (Wash.1989). The act pertaining to water and sewer districts required crediting of federal grant moneys against the total cost of capital improvements because connection charges are only intended to "ensure that new customers pay a proportionate share of the capital costs of facilities to match the sum already paid by the existing customers." Final B. Rep., supra. Thus, the legislature there indicated its overall purpose that an "equitable sharing" of such costs for any water system requires the removal of these moneys before the equitable share of the property owners is calculated.
That the legislature expressly required water and sewer districts to remove federal grant money before calculating the fee to property owners in a law passed 30 years after the legislature first mandated that cities charge an equitable connection fee to share system costs, Laws of 1959, ch. 90, § 8, does not mean that federal grants need not be credited against the cost of systems constructed by municipalities under the earlier legislation. Rather it is indicative of the overarching, common sense, legislative intent that connection charges enable cities to recoup costs in an equitable manner. See 2B Norman J. Singer, Statutes and Statutory Construction 238, at § 53.05 (5 th ed.1992) (chief value of analogous statutes is to show "general course of legislative policy").
Instead of reading this later language properly, the majority uses it to justify the city's windfall by misapplying the expressio *1245 unius est exclusio alterius (specific inclusion excludes by implication) doctrine of statutory construction between statutes rather than within a single statute.[4]See Majority at 1239. Without precedential support the majority misapplies the expressio unius doctrine by reasoning the inclusion of a mandatory deduction of federal grant money in one statute covering water and sewer districts excludes the possibility of such a deduction under a totally separate statute covering cities such as Roy. Majority at 1239. That is to say, inclusion in one chapter of the RCW excludes the same by inference in a totally different chapter. This is error. See, e.g., Bour v. Johnson, 122 Wash.2d 829, 836, 864 P.2d 380 (1993) (applying doctrine to list of exceptions explicitly set out in RCW 6.27.350(1)); Dominick v. Christensen, 87 Wash.2d 25, 26, 548 P.2d 541 (1976) (lawful presence on property limited to specific list set out in RCW 16.08.050); Washington Natural Gas Co. v. PUD 1, 77 Wash.2d 94, 98, 459 P.2d 633 (1969) (applying doctrine to limit entities subject to consumer protection act to those explicitly set out in RCW 19.86.010); State v. Thompson, 38 Wash.2d 774, 779, 232 P.2d 87 (1951) (the term "break" to be limited to the specific definitions listed in Rem.Rev.Stat. § 2303). Expressio unius has no application between statutes and has no application here. This novel and misguided approach was not argued by the parties, nor was it the basis of the Court of Appeals opinion.
In the final analysis the trial court was correct that the unambiguous language of the equitable sharing statute requires Roy to deduct federal grant money prior to computing its connection charge. The alternative is a windfall to the city, general revenue-raising in the name of a compensatory fee, and a farcical determination that an aggregation of "equitable shares" of a system's cost may nearly double the revenue generated.
B. Roy's disparate treatment of Landmark is arbitrary and capricious.
Appellate review of a trial court's findings of fact and conclusions of law is
limited to determining whether a trial court's findings are supported by substantial evidence, and if so, whether those findings support the conclusion of law. Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the declared premise.
American Nursery Prods., Inc. v. Indian Wells Orchards, 115 Wash.2d 217, 222, 797 P.2d 477 (1990) (citations omitted).
The trial court found, without substantial dispute, both the Landmark and New Concept developments were similar in their use of water, CP at 338 (Finding 17), and the cost to the city to provide water to the two developments and maintain and operate the water system for the benefit of each of the two developments was identical. CP at 339 (Findings 23, 25, and 26).[5] Without material factual dispute the trial court also found New Concept was allowed to prepay its water connection charge at the existing rate of $350 while Landmark was not allowed to do so, but instead was forced to wait to pay a higher connection charge of $920 under a subsequently enacted ordinance. CP at 337-39 (Findings 13, 14, 21, and 22).
Consistent with these factual findings the trial judge also found[6] Roy arbitrarily treated *1246 Landmark differently from the way it treated New Concept notwithstanding both were in the same class of users, CP at 341 (Conclusions of Law ¶ 1), i.e., residential users of the same system who sought to prepay. The trial court found such arbitrary treatment damaged Landmark: $34,310 in carrying costs; $21,000 because of Roy's delay of its project; and $28,500 in additional connection charges. CP at 336-41 (Findings 5, 22, 37, and 39).
These factual findings are at the heart of Landmark's case. They must be considered verities for the purpose of this appeal if supported by substantial evidence. See, e.g., State v. Broadaway, 133 Wash.2d 118, 130, 942 P.2d 363 (1997). The majority, however, does not contend they are without evidentiary basis, as obviously they are supported by the record.
Landmark tendered timely payment under the controlling City of Roy's Ordinance 351 which required a fee of $350 per connection. But Roy refused that tender absent any ordinance provision which would prohibit such prepayment, require a prior invoice, or in any other way restrict Landmark's right to prepay. Pl.'s Ex. 2 (City of Roy, Ordinance 351). Therefore on its face the city's refusal of Landmark's tender was without legal authority and consequently arbitrary. See Mission Springs, Inc. v. City of Spokane, 134 Wash.2d 947, 961-62, 954 P.2d 250 (1998) (an arbitrary act is an act in excess of lawful authority).[7]
Even were we to assume Ordinance 351 did grant the city legal authority to treat Landmark differently from New Concept, such authorization for disparate treatment in itself is not immune from review to determine if the city improperly denied Landmark equal protection of the laws. Equal protection under both the federal and state constitutions requires persons similarly situated with respect to the law receive like treatment. Harmon v. McNutt, 91 Wash.2d 126, 130, 587 P.2d 537 (1978). Distinctions in the application of the law without sufficient reason therefore violate equal protection. Id. at 131, 587 P.2d 537. To be sufficient the distinction between classes or members of a class must serve a legitimate governmental objective. Zobel v. Williams, 457 U.S. 55, 63, 102 S.Ct. 2309, 2314, 72 L.Ed.2d 672 (1982); State v. Coria, 120 Wash.2d 156, 169, 839 P.2d 890 (1992).
Roy drew a distinction between two developers, allowing one to prepay its connection fee while refusing the second developer's tender of payment under the same governing ordinance. The city then passed a new ordinance raising the second developer's connection charge by 262.5 percent. But by what sufficient and legitimate reason did the city make this distinction where there is no difference in the cost incurred by the city to provide water and both developments benefited equally from the same water system capital improvements that are touted to justify the increased connection charge?
The simple reason Roy refused Landmark's tender and required it to pay more than two and half times what New Concept prepaid can be found in the minutes of the Roy City Council meeting of October 11, 1993. After the City Attorney advised the Council that it had to accept Landmark's tender, vociferous council opposition arose in the form of complaints about the city's being "out $28,000" and "giving away the farm to these other people. We could use the money." Pl.'s Ex. 1, at C-8, C-16. The basis in the record for this disparate treatment, as *1247 found by the trial court, is simply the city's desire to raise more money from developers who had the misfortune to attempt prepayment at the same time Roy was anticipating raising the fee. Such a motive is understandable, but not legitimate. See Zobel, 457 U.S. at 63, 102 S.Ct. 2309 (statute which rewarded citizens for past contributions to state does not serve legitimate state purpose); Hooper v. Bernalillo County Assessor, 472 U.S. 612, 623, 105 S.Ct. 2862, 2868, 86 L.Ed.2d 487 (1985) (state may not favor established residents over new residents based on view that it may "take care of `its own'").
The only distinction urged by the city to justify the disparate treatment is the difference between the stage of completion of these parallel developments. But the trial judge concluded the fact that New Concept was further along in the development process did not justify different treatment. CP at 341 (Conclusion 1). As this conclusion is amply supported by the court's factual findings that the difference was without a distinction material to the connection charge to be assessed, it must be sustained. See American Nursery Prods., Inc., 115 Wash.2d at 222, 797 P.2d 477.
However the majority, without even disputing any of the factual findings, relies on this immaterial difference. Majority at 1241-42. It never explains why the stage of construction is relevant to foreclosing the prepayment option. Perhaps the majority's conclusion follows its off-hand assertion that the city had a "practice of billing at the time of hook-up." Majority at 1241. But even if that were true, and the record shows otherwise,[8] such a practice cannot serve as its own self-validation. Moreover the record also shows Landmark's lag behind New Concept's construction was caused, at least in part, by the disparate treatment of the two developers by the city during the development process. Verbatim Report of Proceedings (June 21, 1995), Court's Ruling at 3.[9]
If one developer further along in the process may prepay a charge, supposedly based on the system's cost, while another otherwise identical developer may not, we must ask why not? The answer is simple: the city wants all the money it can get, but it did not think about raising the fees until Landmark came along.
Here there is substantial evidence to support the trial judge's factual findings that the two developers were similarly situated yet arbitrarily and capriciously treated differently. These findings support the trial judge's legal conclusion that this disparate treatment was without authority of law and arbitrary. The trial court should be affirmed.
DOLLIVER, J.P.T., concurs.
NOTES
[1] Repealed by Laws of 1996, ch. 230, § 1702 (effective July 1, 1997). With the elimination in 1997 of distinct water and sewer districts and the creation of combined water-sewer districts all under a revised RCW Title 57, RCW 56.08.010 now is effectively recodified at RCW 57.08.005. See RCW 57.02.001.
[2] Recodified at RCW 57.08.005. Laws of 1996, ch. 230, § 301 (effective July 1, 1997).
[3] The trial court made several "findings" that the costs of providing water was the same for both developers. Findings relating to the cost of providing services, while possibly relevant to determining rates, are irrelevant for computing RCW 35.92.025 connection fees.
[4] Landmark claims the Court of Appeals decision was in error because it relied, in part, on facts not found in the record. We do not explore this claim since we have found sufficient facts exist in the record to resolve Landmark's claim without relying on the Court of Appeals alleged error.
[1] RCW 35.92.025 provides:

Cities and towns are authorized to charge property owners seeking to connect to the water or sewerage system of the city or town as a condition to granting the right to so connect, in addition to the cost of such connection, such reasonable connection charge as the legislative body of the city or town shall determine proper in order that such property owners shall bear their equitable share of the cost of such system. The equitable share may include interest charges applied from the date of construction of the water or sewer system until the connection, or for a period not to exceed ten years, at a rate commensurate with the rate of interest applicable to the city or town at the time of construction or major rehabilitation of the water or sewer system, or at the time of installation of the water or sewer lines to which the property owner is seeking to connect but not to exceed ten percent per year: PROVIDED, That the aggregate amount of interest shall not exceed the equitable share of the cost of the system allocated to such property owners. Connection charges collected shall be considered revenue of such system.
[2] Although a presumption exists that an ordinance setting a connection fee is valid, "`when evidence discloses that the basis on which the ordinance establishes the fee is not the proper basis authorized by the statute, the presumption no longer holds.'" Boe v. City of Seattle, 66 Wash.2d 152, 155, 401 P.2d 648 (1965) (quoting the adopted trial court memorandum decision of Walterskirchen, J. (9/23/63)).
[3] Even the majority admits that the connection charge must represent an equitable sharing of the system's cost. Majority at 1238. Thus, the majority's fears as expressed on page 1239 of its opinion are in no way assuaged by the interpretation it offers of the statute at page 1238.
[4] According to Black's, this maxim means

[w]hen certain persons or things are specified in a law, contract, or will, an intention to exclude all others from its operation may be inferred. Under this maxim, if statute specifies one exception to a general rule or assumes to specify the effects of a certain provision, other exceptions or effects are excluded."
Black's Law Dictionary 581 (6 th ed.1990) (emphasis added).
[5] The only cost difference found was that the cost for replacement pipes for the overcharged Landmark might be lower than the costs for New Concept. CP at 340 (Finding 28).
[6] While this finding of arbitrary behavior was part of the trial judge's "Conclusions," it is more properly characterized as a finding of fact. See Robinson v. City of Seattle, 119 Wash.2d 34, 63, 830 P.2d 318 (1992) (noting that it is for the finder of fact to determine if a City had acted arbitrarily and capriciously); Lutheran Day Care v. Snohomish County, 119 Wash.2d 91, 114-15, 829 P.2d 746 (1992) (describing trial judge's "prior finding" that action was arbitrary and capricious). See also Lynn v. Berg Mechanical, Inc., 649 So.2d 139, 142-42 (La.Ct.App.1995) (question of arbitrary and capricious behavior is essentially one of fact not to be disturbed absent manifest error). A finding incorrectly denominated a conclusion of law is reviewed as a finding. Valentine v. Department of Licensing, 77 Wash.App. 838, 846, 894 P.2d 1352 (1995). See also Steele v. Queen City Broadcasting Co., 54 Wash.2d 402, 408, 341 P.2d 499 (1959) (treating improperly denominated "conclusion" as a factual finding on review). Cf. State v. Reader's Digest Ass'n, 81 Wash.2d 259, 266-67, 501 P.2d 290 (1972) (findings of fact that are actually conclusions of law treated as conclusion of law).
[7] Roy's attorney correctly advised the city that it could not refuse Landmark's prepayment under the ordinance. Pl.'s Ex. 1, at C-6. The majority notes that "[a]llthough initially cautious at this meeting, Roy's city attorney later conducted legal research and advised Roy to charge Landmark the new connection fee." Majority at 1237. However, the only additional research done by the City Attorney regarded Landmark's vested rights. Def.'s Ex. 39; Verbatim Report of Proceedings (RP) at 189. There is no indication in the record that the City Attorney ever modified his opinion regarding Landmark's right to prepay the connection charge under Ordinance 351.
[8] The trial judge rejected Roy's proposed finding that "[t]he past practice of the City was to impose the water connection charge at the time the water user was ready to connect." CP at 283. "A refusal by the trial court to make a proposed finding must be considered a finding against the proposing party." Simpson v. Kelso Sch. Dist. No. 403, 20 Wash.App. 545, 549, 581 P.2d 1065 (1978) (citation omitted). There is some support for the contention that it was Roy's practice to bill at the time of hook-up in the trial testimony, see RP at 227; however, it is well established that a trial judge's factual findings based on the court's evaluation of the veracity of witness testimony will not be overturned unless such findings are clearly not supported by the weight of the evidence. Bradley v. Donovan-Pattison Realty Co., 84 Wash. 654, 658, 147 P. 421 (1915).
[9] For example New Concept had installed its water system five months before it entered into a developer's agreement with the City. CP at 339; Def.'s Ex. 38. Landmark, on the other hand, was told that it could not install its waterlines until its plans had been reviewed and approved by the city, and that such review could not even be started until after an executed Developer's Agreement existed. Pl.'s Ex. 16. Unlike Landmark, New Concept was not required to comply with Roy's pipe thickness standards. Verbatim Report of Proceedings (June 21, 1995), Court's Ruling at 3.