[No. 67294-6. En Banc.]
Argued November 16, 1999. Decided April 20, 2000.
MARGARET ALLAN, *Petitioner,* v. THE UNIVERSITY OF WASHINGTON, *Respondent.*

*Hall, Zanzig & Widell*, by *Spencer Hall, Jr.*, for petitioner.
*Bennett Bigelow & Leedom, P.S.*, by *Michael F. Madden*, for respondent.

MADSEN, J. — Margaret Allan, Petitioner, petitioned in Thurston County Superior Court for a declaratory judgment to invalidate procedures adopted by the University of Washington (UW), Respondent, that amended the adjudication process for faculty disciplinary matters provided for in Chapter 28 of the UW Faculty Code. Allan, the wife of a UW professor, argued that the procedures had been promulgated in violation of the Administrative Procedure Act (APA), chapter 34.05 RCW. The trial court agreed and granted summary judgment to Allan. The UW appealed, arguing that Allan lacked standing to initiate her lawsuit. The Court of Appeals, Division Two, reversed. It found that Allan lacked standing and, accordingly, did not reach

the APA question. Allan petitioned for our review. We granted review, and affirm the Court of Appeals.

## FACTS

The relevant facts are uncontroverted in this case. Margaret Allan is the wife of UW Professor Graham Allan. Professor Allan was the subject of a 1989 sexual harassment claim brought by a UW student. In response to that claim, the UW suspended and sought to terminate Professor Allan, but he appealed that action to a faculty committee which reinstated him following proceedings in which his wife was a participant, with separate counsel, under subpoena.

The student subsequently sued the UW, and that lawsuit was settled in 1991. Part of the settlement was an agreement that the UW would seek to have the Faculty Senate change the procedures governing faculty members' appeals of discipline arising out of student complaints. UW President William Gerberding subsequently proposed and strongly encouraged, in a 1992 letter to the chair of the Faculty Senate, changes to the "Faculty Code Adjudicative Procedures" that mirrored the settlement language. Clerk's Papers (CP) at 145. Prior to the adoption of the changes, Allan, through counsel, advised the chair of the Faculty Senate that it was her belief that the UW must comply with the APA in adopting any proposed rule changes—including providing opportunity for public comment—or the changes would be invalid. In response, the UW Division of the Attorney General's Office conveyed to Allan's attorney its opinion that "[t]he revision to the faculty adjudication procedures is not subject to the Administrative Procedures Act because, under RCW 34.05.010(15), rules of institutions of higher education involving employment relationships are not 'rules' within the meaning of the APA." CP at 330.

Changes to the adjudicative procedures in Chapter 28 of the Faculty Code were enacted in 1994 by a faculty vote.

Following that, Allan petitioned for declaratory relief in Thurston County Superior Court—requesting that the court declare the rules invalid and set them aside. The UW moved to dismiss for lack of standing, and the trial court denied this motion and a motion to reconsider. The parties then cross-moved for summary judgment, with neither contending that any issues of material fact precluded the grant of their motions. The trial court issued an oral ruling and entered an order granting Allan's motion in June 1996. The UW appealed, and the Court of Appeals, Division Two, reversed the trial court—finding that Allan lacked standing to challenge the revisions to the Faculty Code, and thus did not address the question of whether the process of promulgating those revisions was in compliance with the APA. *See Allan v. University of Wash.*, 92 Wn. App. 31, 959 P.2d 1184 (1998). Allan petitioned for our review, and review was granted.

## ANALYSIS

The threshold question in this case is whether Margaret Allan has standing to challenge the 1994 revisions to the Faculty Code. The Court of Appeals analyzed Allan's claim under the APA standing rule, RCW 34.05.530:

> A person has standing to obtain judicial review of agency action if that person is aggrieved or adversely affected by the agency action. A person is aggrieved or adversely affected within the meaning of this section *only* when all three of the following conditions are present:
>
> (1) The agency action has prejudiced or is likely to prejudice that person;
>
> (2) That person's asserted interests are among those that the agency was required to consider when it engaged in the agency action challenged; *and*
>
> (3) A judgment in favor of that person would substantially eliminate or redress the prejudice to that person caused or likely to be caused by the agency action.

(Emphasis added.)

■ Of this test, the Court of Appeals wrote that "[t]he first and third prongs are generally called 'injury-in-fact' requirements, while the second is called the 'zone of interest' prong." *Allan*, 92 Wn. App. at 36 (citing *St. Joseph Hosp. & Health Care Ctr. v. Department of Health*, 125 Wn.2d 733, 739, 887 P.2d 891 (1995)). The court observed that our statutory test "is drawn from and explained by federal case law." *Allan*, 92 Wn. App. at 36 (citing RCW 34.05.001) (further citations omitted). Applying the test, the court found that "Mrs. Allan lacks standing under RCW 34.05.530 to seek judicial review of the University's action because she is not a person 'aggrieved or adversely affected' by an agency action." *Allan*, 92 Wn. App. at 36 (citing *St. Joseph Hosp.*, 125 Wn.2d at 739).

Allan argues that "[t]he APA's standing provisions are generously applied." Br. of Resp't at 26 (citations omitted). To illustrate this argument she points to *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 93 S. Ct. 2405, 37 L. Ed. 2d 254 (1973) (*SCRAP*). There the Supreme Court was confronted with a question of standing under the federal APA, and pointed to a number of cases in which the Court had allowed

> important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote . . . a $5 fine and costs . . . and a $1.50 poll tax . . . . While these cases were not dealing specifically with . . . the APA, we see no reason to adopt a more restrictive interpretation of "adversely affected" or "aggrieved." As Professor Davis has put it: "The basic idea that comes out in numerous cases is that an identifiable *trifle* is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation."

*Id.* at 689 n.14 (emphasis added) (citations omitted) (quoting Kenneth Culp Davis, *Standing: Taxpayers and Others*, 35 U. Chi. L. Rev. 601, 613 (1968)). However, the Court has subsequently left the viability of *SCRAP*'s commentary on standing doubtful by writing of it that its "expansive expression of what would suffice for . . . review under its

particular facts has never since been emulated by this Court . . . ." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Furthermore, *National Wildlife Fed'n* declared *SCRAP* irrelevant for purposes of a motion for summary judgment because it involved a "motion to dismiss on the pleadings. The latter, unlike the former, presumes that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (citing *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992), is heavily relied upon by the UW. There, where United States environmental groups sought to challenge, under the Endangered Species Act, the impact of a regulation upon animal species in *foreign* countries, the Court acknowledged that "[o]f course, the desire to use or observe an animal species, even for *purely esthetic* purposes, is *undeniably* a cognizable interest for purpose of standing." *Id.* at 562-63 (emphasis added) (citing *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972)). However, it held that the groups had to demonstrate "not only that listed species were in fact being threatened by funded activities abroad, but also that one or more . . . members would thereby be 'directly' affected apart from their ' "special interest" in th[e] subject.' " *Defenders*, 504 U.S. at 563 (alteration in original) (quoting *Sierra Club*, 405 U.S. at 735, 739). In other words, "the 'injury in fact' test requires *more* than an injury to a cognizable interest. It requires that the party seeking review be . . . among the injured." *Sierra Club*, 405 U.S. at 734-35 (emphasis added).

In *Defenders*, the attempt to obtain standing was based upon affidavits from two environmental group members who had each *once visited* Africa and had *never seen* any endangered species there, but professed a *desire* to return at some indeterminate point in the future to *try to observe* endangered species. *See Defenders*, 504 U.S. at 563. Not surprisingly, the Court noted that "[s]tanding . . . requires,

at the summary judgment stage, a factual showing of perceptible harm." *Defenders*, 504 U.S. at 566.

While Allan is correct in pointing out that *Defenders* had "an incredibly attenuated fact pattern[,]" Br. of Resp't at 30 n.4, it is still applicable to her case. After all, under *Defenders*, Allan must demonstrate "a factual showing of perceptible harm." *Defenders*, 504 U.S. at 566. The harm Allen notes here is that she "participated as a party in the very adjudication and litigation which resulted in these changes." Br. of Resp't at 29. This is true. However, the agency's past action is not the one causing the asserted prejudice. *See* RCW 34.05.530(1). Moreover, the APA test speaks to present harm or more likely future harm. *See* RCW 34.05.530(1). Thus it would be improper to consider the past harm that Allan alleges she suffered as a result of the faculty adjudicative process involving her husband, as a *sole* basis for standing to challenge changes to that process made afterward. The Supreme Court has noted that " '[p]ast exposure to illegal conduct does not in *itself* show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.' " *Defenders*, 504 U.S. at 564 (emphasis added) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 102, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)). The Court of Appeals is correct that Allan's "hypothetical argument that she could [again] someday be a witness in an adjudicatory proceeding is speculative and insufficient to establish standing." *Allan*, 92 Wn. App. at 38. Allan is left with little more than an argument of "procedural injury."

Allan contends, however, that her position is supported by *Seattle Bldg. & Constr. Trades Council v. Apprenticeship & Training Council*, 129 Wn.2d 787, 920 P.2d 581 (1996) (*Trades Council*),[1] a case that involved interpretation of the very statute at issue here: RCW 34.05.530. There, in an

---

[1]Some of the cases that Allan cites to demonstrate liberalization in standing requirements are inapposite here because they did not involve the question of standing under the APA. *See City of Seattle v. State*, 103 Wn.2d 663, 694 P.2d 641 (1985); *Seattle School Dist. No. 1 v. State*, 90 Wn.2d 476, 585 P.2d 71 (1978); *Blondheim v. State*, 84 Wn.2d 874, 529 P.2d 1096 (1975); *State ex rel. Tattersall v.*

opinion relying upon *Defenders*, we wrote that "[w]here an agency refuses to provide a procedure required by statute or the Constitution, the United States Supreme Court 'routinely grants standing to a party' despite the fact that 'any injury to substantive rights attributable to failure to provide a procedure is both indirect and speculative.' " *Trades Council*, 129 Wn.2d at 794 (quoting 3 KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 16.5, at 31 (3d ed. 1994)). We also quoted from another treatise that noted that " '[f]ailure to comply with procedural requirements of itself establishes sufficient injury to confer standing.' " *Trades Council*, 129 Wn.2d at 794 (quoting 13 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3531.4, at 433 (2d ed. 1984)). As we quoted *Defenders* itself: " 'There is this much truth to the assertion that 'procedural rights' are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right *without* meeting all the normal standards for redressability and immediacy.' " *Trades Council*, 129 Wn.2d at 794-95 (emphasis added) (quoting *Defenders*, 504 U.S. at 572 n.7). However, we noted that essential to the assertion of "such procedural rights" was a "concrete interest," although the "fact that any economic injury . . . might not be immediate, or the fact that the decision of the agency would be no different under formal adjudicatory proceedings[,] is not dispositive of the standing question *if* Appellants have a concrete interest protectable by a requirement of formal adjudicatory proceedings." *Trades Council*, 129 Wn.2d at 795 (emphasis added).

In *Trades Council*, labor organizations with trade ap-

---

*Yelle*, 52 Wn.2d 856, 329 P.2d 841 (1958). *Reagles v. Simpson*, 72 Wn.2d 577, 434 P.2d 559 (1967) obliquely, and *Bolser v. Washington State Liquor Control Bd.*, 90 Wn.2d 223, 225-26, 580 P.2d 629 (1978), more directly, are cases addressing standing under an earlier version of the APA that *predated* the 1988 adoption of the more exacting three-prong statutory standing test. *Compare, e.g.*, RCW 34.05.530 (1) ("The agency action . . . is *likely* to prejudice that person . . . ." (emphasis added)) *with Bolser*, 90 Wn.2d at 226 ("[T]he regulation in question or its threatened application *may* interfere with or impair . . . the legal rights or privileges of the plaintiffs . . . ." (emphasis added)) (citing former RCW 34.04.070(1); Kenneth Culp Davis, *Standing, 1976*, 72 Nw. U. L. REV. 69, 80 (1977)). They cannot control today's interpretation of RCW 34.05.530.

prenticeship programs existing at the time that a public agency approved the standards for, and registration of, a competing apprenticeship program, sought judicial review of the question of whether this approval required a formal adjudicatory hearing. We found that these organizations had standing based upon the *likely* diminishment of employment opportunities as a result of the agency's decision for apprentices of "existing programs, including their own." *Trades Council*, 129 Wn.2d at 796. Thus, the "injury in fact" and "zone of interest" prongs of the APA standing test were satisfied. *See* RCW 34.05.530.

 In this case the Court of Appeals found that "Mrs. Allan's claimed interest, at best, is derived from her professor husband and his salary. But Mrs. Allan fails to establish a concrete interest of her own that has been injured by the claimed procedural error." *Allan*, 92 Wn. App. at 37. The UW concedes that Professor Allan would have standing as a contracting faculty member to challenge an improperly promulgated change to the Faculty Code. Allan argues that she should have standing as a part of her husband's marital community, asserting an interest in his income.[2] For support she points to *LaHue v. Keystone Inv. Co.*, 6 Wn. App. 765, 496 P.2d 343 (1972). In that case the widow of a stockholder was found to have standing to maintain a derivative stockholder's suit on the basis of her "one-half community interest in stock held in her husband's name prior to his death," and it did not matter whether the stock was "formally set aside to her in the course of probate of her husband's estate . . . ." *LaHue*, 6 Wn. App. at 776-77 (citations omitted). *LaHue* indicates that not only did it not matter that the widow there was not a shareholder of record, but that her standing was not contingent upon the fact of her husband's death—for she was "not *merely* a legatee, but an owner of that one-half interest." *LaHue*, 6 Wn. App. at 777 (emphasis added).

---

[2]Professor Allan's income is community property, which "[e]ither spouse, acting alone, may manage and control . . . ." RCW 26.16.030.

Thus it was *her* community property interest in the stock itself that gave her standing.

However, *LaHue* is certainly distinguishable here. Professor Allan's interest in the UW's rule-making process is based upon his employment by the UW, not just the income it generates. He has contractual interest in the rules that govern his working conditions. Allan does not share this *individual* interest. She has not shown a concrete interest of her own. " 'By the community property law of this state . . . the legislature did not create an entity or a juristic person separate and apart from the spouses composing the marital community.' " *deElche v. Jacobsen,* 95 Wn.2d 237, 243, 622 P.2d 835 (1980) (quoting *Bortle v. Osborne,* 155 Wash. 585, 589-90, 285 P. 425, 67 A.L.R. 1152 (1930)). The UW employs Professor Allan, not his marital community, and his wife cannot demonstrate that her "asserted interests are among those that the agency was *required to consider* when it engaged in the agency action challenged . . . ." RCW 34.05.530(2) (emphasis added).

▉ Furthermore, "[a] person is aggrieved or adversely affected within the meaning of" the APA standing test only when the zone of interest *and* injury-in-fact prongs are satisfied. RCW 34.05.530. Allan cannot satisfy the injury-in-fact prongs by showing that the UW's action "has prejudiced or is likely to prejudice" her. RCW 34.05.530(1). She cannot show a threat to the only interest that she identifies—her community property interest in Professor Allan's income—that is "sufficiently real;" in other words, a threat that is "neither imaginary nor speculative." *Yesler Terrace Community Council v. Cisneros,* 37 F.3d 442, 446 (9th Cir. 1994) (citing *Blum v. Yaretsky,* 457 U.S. 991, 1000, 102 S. Ct. 2777, 73 L. Ed. 2d 534 (1982)). She does not point to, for example, any pending disciplinary proceeding under the revised Faculty Code that involves Professor Allan. In comparison to the likely economic impacts upon plaintiffs found in *Trades Council,* any threat posed to Allan by the alleged violation of the APA here is quite remote. Absent a concrete interest, injury-in-fact standing under

the APA is not conferred upon the spouse of an administrative agency's employee merely on the basis of an asserted failure on the part of the agency to follow procedural requirements.

In conclusion, we find that Allan has not met the statutory test for standing in an APA case. In light of this disposition, we cannot reach the question of whether the changes to the Faculty Code were required to be adopted in compliance with the APA. We affirm the Court of Appeals.

GUY, C.J., JOHNSON, ALEXANDER, TALMADGE, and IRELAND, JJ., and COLEMAN and SHIELDS, JJ. PRO TEM., concur.

SANDERS, J. (dissenting) — The issue in this case, at its threshold, is whether Mrs. Margaret Allan, wife of University of Washington (UW) professor G. Graham Allan, has standing under the Washington Administrative Procedure Act (APA), chapter 34.05 RCW, to challenge revisions to UW's Faculty Code. If she does, the issue, which neither the Court of Appeals nor majority addresses, becomes whether the UW's Faculty Code revisions fall under the ambit of the APA and, if so, whether the UW's promulgation of the revisions runs afoul of it. It seems clear to me Mrs. Allan has as much standing to challenge the Faculty Code revisions as does her professor husband because of her community property share in his employment contract with UW. I would therefore go to the merits of her claim and, for reasons I shall discuss below, affirm the trial court that these rules must be adopted in accordance with the APA or not at all.

## STANDING

The linchpin of the Court of Appeals decision, and the majority's opinion which affirms it, is "Mrs. Allan lacks standing under RCW 34.05.530 to seek judicial review of the University's action because she is not a person 'aggrieved or adversely affected' by an agency action." *Allan v. University of Wash.*, 92 Wn. App. 31, 36, 959 P.2d 1184

(1998) (quoting *St. Joseph Hosp. & Health Care Ctr. v. Department of Health*, 125 Wn.2d 733, 739, 887 P.2d 891 (1995)), *review granted*, 137 Wn.2d 1019, 980 P.2d 1280 (1999). This conclusion is the result of correctly stating, but ultimately misapplying, the statutory "aggrieved or adversely affected" test for standing under the APA, which requires:

(1) The agency action has prejudiced or is likely to prejudice that person;

(2) That person's asserted interests are among those that the agency was required to consider when it engaged in the agency action challenged; and

(3) A judgment in favor of that person would substantially eliminate or redress the prejudice to that person caused or likely to be caused by the agency action.

RCW 34.05.530(1)-(3). The majority correctly notes this test embodies " 'injury-in-fact' " and " 'zone of interest' " prongs. Majority at 327 (quoting *Allan*, 92 Wn. App. at 36 (citing *St. Joseph Hosp. & Health Care Ctr.*, 125 Wn.2d at 739)). According to the majority, echoing the Court of Appeals, Mrs. Allan must show a "concrete interest of her own" in the outcome of the UW action in order to have standing under the APA. Majority at 332-33 ("Absent a concrete interest, injury-in-fact standing under the APA is not conferred upon the spouse of an administrative agency's employee merely on the basis of an asserted failure on the part of the agency to follow procedural requirements."); *Allan*, 92 Wn. App. at 37 ("Allan fails to establish a concrete interest of her own that has been injured by the claimed procedural error.").

However it is unclear what sort of "concrete interest" test the majority is mixing. Mrs. Allan is within the "zone of interest" under RCW 34.05.530 because of her right of equal management of the property acquired through the marital community of herself and Professor Allan. Majority at 331; RCW 26.16.030. There is no question Mrs. Allan has a community interest in Professor Allan's employment

contract. The income he earns through his employment is a community asset, whereas any economic liabilities he incurs under the contract, e.g., by the operation of a Faculty Code provision incorporated into that contract, are going to be community liabilities. The trial court correctly held Mrs. Allan has standing to challenge the Faculty Code revision on the independent basis of her community property interest as the spouse of Professor Allan. Clerk's Papers (CP) at 181, 191.

The UW concedes Professor Allan, like any UW professor, would have automatic standing to challenge UW rulemaking or adjudicatory actions under the APA. *See* Supplemental Br. of Resp't at 10; Tr. of Oral Argument to Court of Appeals at 3. It is truly inexplicable, then, how the majority reaches its conclusion, after having recognized the UW's concession on this point.

That Mrs. Allan's community property share of Professor Allan's employment contract places her within the zone of a concrete interest is supported by our decision in *LaHue v. Keystone Inv. Co.*, 6 Wn. App. 765, 496 P.2d 343, *review denied*, 81 Wn.2d 1003 (1972). There, as the majority points out, the widow of a stockholder was found to have standing to maintain a derivative stockholder's suit on the basis of her " 'one-half community interest in stock held in her husband's name prior to his death,' and it did not matter whether the stock was 'formally set aside to her in the course of probate of her husband's estate.' " Majority at 331 (quoting *LaHue*, 6 Wn. App. at 776-77).

The majority's attempt to distinguish *LaHue* is as arbitrary as it is unsatisfactory. *See* Majority at 332. The majority states *LaHue* involved solely an economic interest—the wife's community share in the husband's stock. Here, the majority argues, Professor Allan's employment contract embodied contractual interests "individual" to him that Mrs. Allan "does not share." Majority at 332. This unidentified individual "contractual interest" (*id.*) is a red herring for the purposes of our analysis. No one seriously doubts the core interests of Professor Allan's employ-

ment contract are the salary and benefits he earns as a UW professor, which are community property assets he shares with Mrs. Allan. The unspecified contractual interest (*id.*) the majority spins out of whole cloth simply does not pay the bills. Mrs. Allan, then, has just as much a concrete interest in her husband's employment contract as the spouse in *LaHue* had in her husband's stock. For purposes of satisfying the "concrete interest" prong—even the ultra-restrictive one the majority has mixed on the spot—the interest inherent in the community property is sufficient.

The majority attempts to avoid this conclusion by distinguishing Professor Allan's employment with the UW from the mere income it generates, claiming Mrs. Allan has a community property interest in the latter but not the former. Majority at 332 ("The UW employs Professor Allan, not his marital community . . . ."). This distinction is without a difference in the present case. Professor Allan's very employment with the UW is undertaken as an agent of, and in furthering the interests of, the marital community. This is illustrated by the fact that whether or not his employment generated income, the marital community of which he is an agent would be liable should he commit a tort within the scope of his employment as his employment is in the benefit of the marital community. *deElche v. Jacobsen*, 95 Wn.2d 237, 245, 622 P.2d 835 (1980) ("Torts which can properly be said to be done in the management of community business, or for the benefit of the community, will remain community torts with the community and the tort-feasor separately liable."). It is therefore community employment. Here the community nature of Professor Allan's employment is doubly proved as he earns income that is community property. To the extent Mrs. Allan has a community property interest in the income Professor Allan generates, she has an interest in the employment that gives rise to that income under our long-standing precedent that is sufficient to confer APA standing in this case. *See In re Marriage of Lindemann*, 92 Wn. App. 64, 72, 960 P.2d 966 (1998) ("Ordinarily, a marital community is entitled to the fruits of all labor performed by either party to the relation-

ship because each spouse is the servant of the community.")
(citing *Yesler v. Hochstettler*, 4 Wash. 349, 366, 30 P. 398
(1892); *In re Marriage of Brown*, 100 Wn.2d 729, 737, 675
P.2d 1207 (1984)), *review denied*, 137 Wn.2d 1016 (1999).

Its half-hearted attempt to distinguish *LaHue* notwith-
standing, the majority cannot seriously claim Mrs. Allan
lacks a concrete interest in the UW's rule-making here.
Thus the majority's standing analysis would seem to center
on the "injury-in-fact" prong of the APA standing test.
However an argument that Mrs. Allan fails to aver an ade-
quate injury-in-fact is conspicuously lacking in the majority
opinion. Rather the majority collapses back in upon itself,
arguing that by failing to aver anything other than a " 'hy-
pothetical argument that she could [again] someday be a
witness in an adjudicatory proceeding,' " which is " 'specu-
lative and insufficient to establish standing,' " and
therefore, "Allan is left with little more than an argument
of 'procedural injury.' " Majority at 329 (alteration in origi-
nal) (quoting *Allan*, 92 Wn. App. at 38). The majority
continues, The "threat posed to Allan by the alleged viola-
tion of the APA here is quite remote." Majority at 332.
Then, in the very next sentence, the majority brings us full
circle: "Absent a *concrete interest*, injury-in-fact standing
under the APA is not conferred . . . ." *Id.* (emphasis add-
ed). But I have already demonstrated as unpersuasive the
majority's argument that Mrs. Allan lacks a concrete inter-
est in the underlying UW proceedings.

With respect to Mrs. Allan's putatively " 'procedural
injury,' " Majority at 329 (quoting *Allan*, 92 Wn. App. at
38), the majority's analysis places itself directly at odds
with the law the majority itself cites. In *Trades Council* for
example, as the majority quotes at page 330, we noted
"[w]here an agency refuses to provide a procedure required
by statute or the Constitution, the United States Supreme
Court 'routinely grants standing to a party' despite the fact
that 'any injury to substantive rights attributable to failure
to provide a procedure is both indirect and speculative.' "
*Seattle Bldg. & Constr. Trades Council v. Apprenticeship &*

*Training Council,* 129 Wn.2d 787, 794, 920 P.2d 581 (1996) (quoting 3 KENNETH CULP DAVIS & RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 16.5, at 31 (3d ed. 1994)), *cert. denied,* 520 U.S. 1210, 117 S. Ct. 1693, 137 L. Ed. 2d 820 (1997). Further, as the majority acknowledges, " ' "[f]ailure to comply with procedural requirements of itself establishes sufficient injury to confer standing." ' " Majority at 330 (quoting *Trades Council,* 129 Wn.2d at 794 (quoting 13 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3531.4, at 433 (2d ed. 1984))). And further, " '[t]here is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.' " *Trades Council,* 129 Wn.2d at 794-95 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 572 n.7, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).

The majority would take us outside the sweep of this law by noting, "However, we noted that essential to the assertion of 'such procedural rights' was a 'concrete interest' . . . ." Majority at 330. Again the majority collapses its analysis into the "concrete interest" prong. As I have demonstrated, Mrs. Allan's concrete interest undeniably flows from the marital community between herself and Professor Allan. Perhaps the majority would here unwittingly overrule the standing portion of the *Trades Council* decision; but if that is its intent, it should say so clearly.

As Mrs. Allan's concrete interest in the community property (which is Professor Allan's employment contract) is sufficient to grant her standing under RCW 34.05.530, I would recognize Mrs. Allan's standing to challenge the UW's procedures under the APA, and thus move to the merits of the underlying appeal.

## APA COMPLIANCE

There is no question in this case that the revisions to the adjudication procedures in the Faculty Code here at issue

were not adopted in compliance with the notice and comment requirements of the APA. *See* RCW 34.05.320, .325; *Allan*, 92 Wn. App. at 35 n.1. The UW admits this. *See* CP at 51. Had the majority correctly determined Mrs. Allan had standing, the question properly becomes whether the process by which the UW adopted the 1994 changes to its Faculty Code was governed by the APA in the first place. If they were, the APA was violated.

The APA defines what constitutes a "[r]ule":

> [A]ny agency order, directive, or regulation of general applicability . . . (b) which establishes, alters, or revokes any procedure, practice, or requirement relating to agency hearings. . . . The term includes the amendment or repeal of a prior rule, but does not include . . . (iv) rules of institutions of higher education involving standards of admission, academic advancement, academic credit, graduation and the granting of degrees, *employment relationships*, or fiscal processes.

RCW 34.05.010(16) (emphasis added). The UW "operates under the principle of 'shared governance,' whereby the faculty and administrators share authority for running the institution." Br. of Appellant at 7. This principle is embodied in RCW 28B.20.200: "The faculty of the University of Washington shall consist of the president of the university and the professors and the said faculty shall have charge of the immediate government of the institution under such rules as may be prescribed by the board of regents." Changes in the rules involving the "employment relationships" of faculty, as embodied in the Faculty Code, are initiated and approved by the faculty. *See* CP at 450.

The 1994 revisions to the Faculty Code that were adopted through the process challenged here did not, however, relate only to the employment rights of UW faculty members. They also involved rights of "[n]onparty participant[s] of right:" "[T]he person or persons who are alleged to be the *victims* of any harassment, discrimination or other wrongdoing . . . ." CP at 259 (Ex. A to aff. of L. Mark Eichorn, "Proposed Revisions to Faculty Code Provisions Regarding Adjudications (Chapter 28)") (emphasis added).

The Faculty Code revisions also provide for a role for "[p]ermissive nonparty participant[s]:" "[A]ny person who has a substantial interest that will be affected by the outcome of a Comprehensive Adjudication and whose request to participate in the proceeding has been granted by the Hearing Officer . . . ." CP at 259. Rights of participation, counsel, cross-examination, and access to evidence were prescribed for the nonparty participants. *See* CP at 279-81. The authority of the hearing officer with regard to issuing discovery and protective orders was delineated. *See* CP at 286-87. These orders, ironically, are enforceable through the APA's provisions "regarding civil enforcement of agency actions." CP at 287. The APA is also the source of the hearing panel's statutory power to issue subpoenas, as provided for in the revisions. *See* CP at 286; RCW 34.05.588. As Mrs. Allan correctly notes: "The revisions include numerous provisions defining, creating, and limiting rights of nonfaculty without any input from them" as would be required under the APA. Br. of Resp't at 19.

The UW argues that the 1994 revisions to the Faculty Code at issue here fall under the above exemption from the APA for "rules of institutions of higher education involving . . . employment relationships." The UW makes much of the meaning of the word "involving" in RCW 34.05.010(16), noting, correctly, that "[t]he starting point for analyzing this issue is, of course, the language of the statute itself." Br. of Appellant at 29 (citing *State v. Young*, 125 Wn.2d 688, 694, 888 P.2d 142 (1995)). It points to the fact that under the former Higher Education APA "the exemption extended only to rules *'relating primarily'* to employment relationships." Former RCW 28B.19.020(2), *repealed by* LAWS OF 1988, ch. 288, § 701. In replicating language from this predecessor statute into the 1988 APA the legislature substituted "involving . . . employment relationships" for "relating primarily to . . . employment relationships[.]" The UW turns to a dictionary definition of the word "involve" to suggest that the legislature's use of the word "makes it apparent that the Legislature did not intend to

limit the scope of exempt rules to those impacting exclusively on faculty members." Br. of Appellant at 30. However, it could just as easily be argued that the UW is using the word "involving" to allow an exception to swallow a rule.[3] As Mrs. Allan notes, "the University emphasizes the dictionary meaning of the term 'involving,' extrapolating from the definition to conclude that *any* rule having *any* nexus with employment relationships—*no matter the impact on others*—'involves' employment relationships and is therefore exempt from APA requirements." Br. of Resp't at 16 (emphasis added). She argues that "[t]he University may not insulate rules substantially affecting non-faculty rights from review simply by including them with other provisions which affect only faculty." *Id.* at 12. Even if it can be reasonably conceded that the legislature foresaw the impact that exempting the employment relationships of faculty members would have upon their *spouses*, and thus impacts upon spouses alone would not bring changes to the Faculty Code under the APA, it could scarcely be extrapolated from that fact that the legislature intended that the complaints of *victims* of those faculty members (e.g., victims of sexual harassment) should be laundered through an adjudicative process that they and other members of the public would have had no part in shaping.

---

[3]For example, the UW writes,

[C]ommon sense informs us, as it would the Legislature, that decisions about employment of faculty necessarily impact third parties to the employment contract, such as family of faculty, students, and other persons affected by the faculty member's work. In the University setting, the latter might include patients being treated by medical faculty, companies and agencies making grants to researchers, or even persons who hope to benefit from a faculty member's work, such as developing a new drug or surgical technique, or writing a prize-winning novel.

Br. of Appellant at 30. Even assuming all this to be true, how does it diminish Mrs. Allan's argument? The UW does not point to any rules outside of the APA providing for an adjudicatory process that allows, for example, a third person aggrieved by a faculty member's "prize-winning novel" to complain and be subject to discovery and subpoenas. No one is disputing that faculty members interact with the world outside of the UW. The question is whether, when they *victimize* someone outside of the employment relationship, the disciplinary process can take place through rules adopted entirely outside of the APA.

Mrs. Allan appropriately points to the federal courts' treatment of a comparable federal APA section, 5 U.S.C. § 553 (1994), as guidance for when the APA rule-making requirements should apply, and also points to the example of other states. *See* RCW 34.05.001 ("[C]ourts should interpret provisions of this chapter [the APA] consistently with decisions of other courts interpreting similar provisions of other states, the federal government, and model acts.").

Under 5 U.S.C. § 553, "[g]eneral notice of proposed rule-making shall be published in the Federal Register," § 553(b), in most cases, and after notice "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments[,]" § 553(c), and "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule," § 553(e). However, these provisions do not apply to exceptions analogous to the higher education exemption at issue here, exemptions covering "a matter relating to agency management or personnel[,]" § 553(a)(2), and "rules of agency organization, procedure, or practice . . . ." § 553(b)(A).

Mrs. Allan points to a "substantial impact test" that has been used under § 553(a)(2) and § 553(b)(A) "to determine whether the agency is required to comply with the APA rule-making requirements." Br. of Resp't at 12-13. The question is whether the agency action has a substantial impact on private rights and interests of those outside the agency (in this case, nonfaculty). For example, where the United States Civil Service Commission attempted to invoke the § 553(a)(2) exemption for a challenged regulation the D.C. Circuit Court of Appeals held that "although the Commission's regulation is only directed at government personnel it does not fall within section 553(a)(2) because outside individuals are substantially affected." *Joseph v. United States Civil Serv. Comm'n*, 554 F.2d 1140, 1153 n.23 (D.C. Cir. 1977). In another case, where the United States Department of Labor invoked the § 553(b)(A)

exemption to try to shield from the federal APA a modification of its method of calculating employment statistics, the D.C. Circuit noted first that the exception "was provided to ensure that agencies retain latitude in organizing their internal operations." *Batterton v. Marshall*, 648 F.2d 694, 707 (D.C. Cir. 1980). However, it held that "[t]he exemption cannot apply . . . where the agency action trenches on substantial private rights and interests." *Id.* at 708. This was in keeping with the idea that "[t]he essential purpose of . . . notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." *Id.* at 703.

Other "substantial impact" cases that Mrs. Allan cites relate to exemption clauses similar to RCW 34.05.010(16)(i): "[S]tatements concerning only the internal management of an agency and *not affecting private rights or procedures available to the public* . . . ." (Emphasis added.) *See Woodland Private Study Group v. Department of Envtl. Protection*, 109 N.J. 62, 70, 533 A.2d 387, 389-91 (1987) (construing intra-agency and interagency statements as used in N.J. STAT. ANN. § 52:14B-2(e); *Persico v. Maher*, 191 Conn. 384, 465 A.2d 308, 318 (1983) (interpreting language identical to RCW 34.05.010(16)(i) in CONN. GEN. STAT. § 4-166(7)). While RCW 34.05.010(16)(i), under which a "substantial impact" test certainly might be appropriate to measure whether statements affect "private rights or procedures available to the public[,]" is *not* implicated here, nevertheless analysis of the language of RCW 34.05-.010(16)(i) cannot lead one to the UW's conclusion that it is also the exemption "most analogous" to the 5 U.S.C. § 553 exemptions at issue in *Joseph* and *Batterton.* Those exemptions are "similar" enough to the higher education exemption at issue here that their construction should guide this court. *See* RCW 34.05.001.

As the UW points out, our higher education exemption is without an *identical* federal parallel—and Mrs. Allan does not point us to such a parallel in another state. On its face,

unlike .010(16)(i) which precedes it, our higher education exemption does not speak to "private rights or procedures available to the public[.]" *See* RCW 34.05.010(16) (simply providing that rules governed by the APA do "not include . . . (iv) rules of institutions of higher education involving standards of admission, academic advancement, academic credit, graduation and the granting of degrees, employment relationships, or fiscal processes."). Accordingly, in interpreting the higher education exemption, the UW argues that when the legislature wants to protect third parties "it knows how to do so[,]" as evidenced by "the very same section of the APA[.]" Br. of Appellant at 33.

It is true, for example, that rules involving "standards of admission, academic advancement, academic credit, graduation and the granting of degrees" are going to impact persons inside and outside the university (i.e., both students and applicants), and that this could have been contemplated by the legislature only in exempting such rules from the APA. The UW contends that its argument that the legislature "recognized the impact on third parties when it added the challenged exemption to the new APA" is supported by these impacts. However the UW undermines itself when it points to RCW 34.05.010(16)(i) to make an expressio unius est exclusio alterius argument. *See* Br. of Appellant at 33, 36 (citing *Bour v. Johnson*, 122 Wn.2d 829, 836, 864 P.2d 380 (1993)). The UW is correct in that the legislature *did* expressly identify the interests of the public as not being abrogated by another APA exemption—the exemption for "statements concerning only the internal management of an agency and not affecting private rights or procedures available to the public . . . ." RCW 34.05-.010(16)(i). We see from this provision the legislature limited the exemption for "statements concerning only the internal management of an agency" to those "not affecting private rights or procedures available to the public . . . ." The broad scope of the APA's application to state agencies is demonstrated by the fact that, without an express exemption, simple "statements" could otherwise be construed as

rules.[4] The language of the "statements" exemption does not support the conclusion that by not expressly qualifying "employment relationships" when it exempted the "rules of institutions of higher education," the legislature meant for the scope of "employment relationships" to be so indefinite as to allow those relationships in universities to infringe upon "private rights or procedures affecting the public . . . ."

Instead, the use of the term "employment relationships" is part of the *express limitation* of the types of "rules of institutions of higher education" that are exempt from the APA. The higher education exemption is a *narrow* exemption. Were it otherwise, the legislature could have simply exempted "rules of institutions of higher education" without adding more. " 'Where a statute specifically designates the things or classes of things upon which it operates, an inference arises in law that all things or classes of things omitted from it were intentionally omitted by the legislature under the maxim expressio unius est exclusio alterius—specific inclusions exclude implication.' " *Landmark Dev., Inc. v. City of Roy*, 138 Wn.2d 561, 571, 980 P.2d 1234 (quoting *Washington Natural Gas Co. v. Public Util. Dist. No. 1*, 77 Wn.2d 94, 98, 459 P.2d 633 (1969)). Thus the "implication" that "employment relationships" include rights of persons outside those two-party relationships, rights that UW seeks to take outside of the APA (while paradoxically *invoking* the APA in the rule changes in order to enforce its power over those rights through discovery and protective orders and subpoenas), is presumptively invalid. *Cf. State v. Sommerville*, 111 Wn.2d 524, 535, 760 P.2d 932 (1988) ("Under the rule of *expressio unius est exclusio alterius* . . . these exceptions are exclusive, and the further exception carved out by the trial court here is barred.") (citing *Queets Band v. State*, 102 Wn.2d 1, 5, 682 P.2d 909 (1984); *Washington Natural Gas Co.*,

---

[4]The UW is "an agency" that enjoys the APA's exemption for "statements" under RCW 34.05.010(16)(i). Thus, this exemption and the higher education exemption run on parallel tracks in their application to the UW.

77 Wn.2d at 98; *State v. Roadhs*, 71 Wn.2d 705, 707, 430 P.2d 586 (1967)).

Therefore the process by which the challenged changes to chapter 28 of the UW Faculty Code were adopted in 1994 should have been governed by the notice and comment provisions of the APA, inasmuch as they did not solely involve "employment relationships." Given there are no outstanding issues of material fact, we should reinstate the trial court's summary judgment in favor of Mrs. Allan.

## CONCLUSION

The UW has conceded that a faculty member, such as Professor Allan, would have had standing under RCW 34.05.530 to challenge the rules adopted here. *See* Supplemental Br. of Resp't at 10; Tr. of Oral Argument to Court of Appeals at 3. This is presumably due to his affected salary interest, which is community property that "[e]ither spouse, acting *alone*, may manage and control." RCW 26.16.030 (emphasis added). *LaHue* and *Trades Council* both provide support for Mrs. Allan's argument that she should have standing based upon this community property interest to challenge the process by which changes to chapter 28 of the UW Faculty Code were adopted in 1994.

Reaching the merits, the UW's revision of the Faculty Code violated the APA, inasmuch as the narrow exception for "rules of institutions of higher education involving . . . employment relationships[,]" RCW 34.05.010(16)(iv), was exceeded in adopting rules that impact the third-party rights of *victims*, and witnesses to victimization (through subpoena), of those employees. Under these changes to the Faculty Code "outside individuals are substantially affected." *Joseph*, 554 F.2d at 1153 n.23. The majority should be mindful of the primary purpose behind the APA. When it adopted the 1988 APA, the legislature declared that it intended "to provide greater public and legislative access to administrative decision making." RCW 34.05.001. As Professor Andersen wrote:

The purpose of rulemaking procedures is to ensure that

members of the public can participate meaningfully in the development of agency policy that affects them. When the questioned agency action will affect the public in a general way and where notice to and comment by the affected public seems useful, the action should be regarded as a rule.

William R. Andersen, *The 1988 Washington Administrative Procedure Act—An Introduction*, 64 WASH. L. REV. 781, 791 (1989).[5] Similarly, the D.C. Circuit in *Batterton* wrote that "[e]xemptions should be recognized only where the need for public participation is overcome by good cause to suspend it, or where the need is too small to warrant it, as for example, when the action in fact does not conclusively bind . . . affected private parties." *Batterton*, 648 F.2d at 704 (footnote omitted).

In light of the APA violation, the trial court's summary judgment order in favor of Mrs. Allan should be affirmed and the Court of Appeals should be reversed.

Accordingly I dissent.

---

[5]Professor Andersen, the UW's own resident expert on the APA, opined these revisions were subject to the Act. In response to a question "regarding the applicability of the APA's rule-making provisions to the revisions" to the Faculty Code, CP at 135, Andersen, in an e-mail, wrote:

1. The question you ask is open.

2. The act has a narrow exemption of university rules . . . . This list doesn't seem to me to exempt our adjudication rules. Moreover, it makes clear by implication that university rules generally ARE within the act.

. . . .

4. My own position is that all rules with significant impacts (as these rules clearly do) should be run through the rulemaking procedures of the APA and I think there is enough in the rule definition in the section cited above to make a good case for that—especially since outside judges (who decide these things) have not always been as enthusiastic about the iviolability [sic] of "internal" university processes as us insiders tend to be.

CP at 135 (citing 34.05.010(15)). Andersen's expertise on the subject of the APA, in the form of his seminal law review article on it, has been acknowledged and relied upon by this court in the past. *See Aviation W. Corp. v. Department of Labor & Indus.*, 138 Wn.2d 413, 419, 980 P.2d 701 (1999); *Seattle Bldg. & Constr. Trades Council v. Apprenticeship & Training Council*, 129 Wn.2d 787, 797, 920 P.2d 581 (1996); *St. Joseph Hosp. & Health Care Ctr. v. Department of Health*, 125 Wn.2d 733, 739, 887 P.2d 891 (1995); *Neah Bay Chamber of Commerce v. Department of Fisheries*, 119 Wn.2d 464, 473, 832 P.2d 1310 (1992).