[No. 36811-1-II.   Division Two.   March 3, 2009.]

THE CITY OF GIG HARBOR, *Appellant*, v. NORTH PACIFIC DESIGN, INC., ET AL., *Respondents*.

*Carol A. Morris* (of *Law Office of Carol A. Morris, PC*), for appellant.

*Alexander W. Mackie* and *Kathleen M. O'Sullivan* (of *Perkins Coie, LLP*), for respondents.

*Sean K. Howe* (of *Cairncross & Hempelmann, PS*), for intervenor.

¶1 HUNT, J. — The city of Gig Harbor (City) appeals the City hearing examiner's (Hearing Examiner) decision to approve North Pacific Design, Inc.'s application for a con-

ditional use permit (CUP) allowing a density of 11.75 units per acre for a proposed residential development. The City argues that North Pacific cannot use a Planned Residential Development (PRD) to build at this density because it conflicts with the requirements of the underlying Residential Business-2 (RB-2) zone. The City also asks us to affirm the Hearing Examiner's decision that North Pacific cannot count perimeter setback areas toward the 30 percent "open space" calculation required for a PRD. Holding that the PRD and the underlying zoning are not mutually exclusive and that the municipal code's definition of "required yards" does not include perimeter setbacks, we (1) affirm the Hearing Examiner's conclusion that North Pacific's proposal falls within the density limits established for the underlying zone and (2) reverse the Hearing Examiner's conclusion that North Pacific improperly included its perimeter setback areas in calculating the PRD 30 percent minimum open space requirement and the Hearing Examiner's order that North Pacific recalculate its open space.[1]

## FACTS

¶2 North Pacific Design applied for a 174-lot residential preliminary plat, a PRD, and a CUP to develop 18.8 acres of property at the northeast corner of Hunt Street and Skansie Avenue within the city limits of Gig Harbor. North Pacific intended that the proposed development, "The Courtyards at Skansie Park" (Skansie Park), serve as a transitional buffer between high intensity commercial areas and lower intensity residential areas.

### I. BACKGROUND

¶3 The City had previously annexed this development site under its 1994 concomitant zoning agreement for the

---

[1] In so doing, we also affirm the superior court's (1) affirmance of the Hearing Examiner's approval of the 11.75 units per acre density and (2) reversal of the Hearing Examiner's ruling that North Pacific cannot count perimeter setback areas toward the required 30 percent open space calculation.

Tallman annexation (Concomitant Agreement), zoning the area as RB-2 under Title 17 of the Gig Harbor Municipal Code (GHMC). The Hearing Examiner decided this matter on January 24, 2007, under the former version of the GHMC. Former GHMC 17.30.050 (2004) outlined RB-2 development standards and provided design requirements for residential and commercial lots within this district.[2] Former GHMC 17.30.050 designated minimum lot, yard, and setback measurements, requiring front yard setbacks to extend at least 20 feet from the structure.

¶4 Former GHMC 17.30.050(G) established maximum density requirements, providing for "[e]ight dwelling units per acre permitted outright; 12 dwelling units per acre allowed as a conditional use." Because North Pacific wanted to increase Skansie Park's density beyond eight dwelling units per acre, it proposed using a PRD scheme under former GHMC 17.89.100 (2004) to reduce the property's lot sizes and setback space. To meet the municipal code's density requirements, North Pacific applied for a conditional use permit, calculating its proposed density at 11.75 units per acre (which fell within the cap of 12 dwelling units per acre, permitted as a conditional use).

¶5 In addition, former GHMC 17.78.060(B) (2004) required developers to designate 25-foot deep, densely vegetated buffers around the site's perimeter. Similarly, the Concomitant Agreement required developers to provide 40-foot deep buffers along boundaries with single family uses (here, along Skansie Park's northern and western boundaries). In its proposal, North Pacific provided buffers and perimeter setbacks to conform to the municipal code's requirements; in so doing, North Pacific retained a significant amount of vegetation and a wetland area, and designed common parks and public trails. North Pacific also

---

[2] The City's comprehensive land use map designated Skansie Park's site as an "Employment Center." Although residential uses were not expressly identified within this designation, the City's Hearing Examiner found that the proposed land use complied with City's RB-2 zoning restrictions and the Concomitant Agreement.

proposed using a residential design that would reflect the historical character of the area by providing for specific roof pitch and vertical windows.

¶6 Additionally, the municipal code required PRD developers to set aside at least 30 percent of the property site as open space, former GHMC 17.89.110(A) (2001), which for North Pacific's 18.8 acre site required 5.58 acres of open space. North Pacific proposed setting aside 5.66 acres of open space, which is 31.064 percent of Skansie Park's total area. In calculating the required percentage of open space, however, North Pacific included the area of its 20-foot perimeter setbacks, which run coextensively with its perimeter buffer.[3]

## II. PROCEDURE

### A. Planning Staff Recommendation

¶7 The city planning staff recommended approval of North Pacific's preliminary plat and conditional use permit application with several conditions. One condition prevented North Pacific from using the mandatory (20 foot) perimeter setback space to satisfy the 30 percent minimum open space requirement. The planning staff also concluded that North Pacific's proposal, as thus mitigated, was consistent with Gig Harbor's comprehensive plan and the municipal code's underlying zoning regulations.

### B. Hearing Examiner's Grant of PRD and CUP

¶8 The city Hearing Examiner conducted an "open record hearing," during which the parties submitted witnesses' testimony and exhibits. The Hearing Examiner also

---

[3] The municipal code provides, "Structures located on the perimeter of the PRD shall be set back in accordance with the front yard setbacks of the underlying zone." GHMC 17.89.060(A)(2). Here, the underlying zone was an RB-2 district, which imposed a 20-foot front yard setback. Former GHMC 17.30.050. The municipal code did not specify from what or from where the front yards are set back.

reviewed numerous letters and heard testimony from community members opposed to North Pacific's development plan.

¶9 The Hearing Examiner ultimately approved North Pacific's applications for the preliminary plat, PRD, and CUP, subject to certain conditions. Concluding that the PRD provisions and the RB-2 regulations "can, and should read harmoniously," the Hearing Examiner (1) noted that the Municipal Code expressly permitted a 12-unit density in the RB-2 zone with a conditional use permit,[4] former GHMC 17.30.050(G); (2) ruled that because the PRD application did not seek a density greater than that conditionally permitted in the underlying RB-2 zone, the application did not constitute a rezone; (3) approved North Pacific's proposed increased density; and (4) granted North Pacific a conditional use permit to build 11.75 dwelling units per acre, based on certain conditions, including revision of the required 30 percent set-aside open space.

¶10 The Hearing Examiner concluded that North Pacific's proposal did not set aside the required 30 percent of open space based on his findings that (1) even though North Pacific proposed to set aside 5.66 acres, which comprised 31 percent of the development site, it had improperly counted the development's perimeter setback areas toward the 30 percent open space requirement and (2) after excluding these perimeter setback areas from North Pacific's set-aside calculation, the proposed open space fell short of the

---

[4] Former GHMC 17.30.050 provided the following development standards for RB-2 district:

A. Minimum lot area: 12,000 square feet;

B. Minimum lot width: 70 feet;

C. Front yard setback: 20 feet;

D. Side yard setback: eight feet;

E. Rear yard setback: 15 feet;

F. Any nonresidential yard abutting an existing residential use or zone: 40 feet with dense vegetative screening. Easements not having dense vegetative screenings are not included;

G. Maximum Density: Eight dwelling units per acre permitted outright; 12 dwelling units per acre allowed as a conditional use.

Former GHMC 17.30.050 (2004).

required 30 percent mark by 26,382 square feet. Therefore, as a condition of PRD approval, the Hearing Examiner required North Pacific to revise its open space calculation to exclude the perimeter setbacks areas from the required 30 percent minimum.

## C. City's LUPA Appeal to Superior Court

¶11 The City appealed the Hearing Examiner's decision in Pierce County Superior Court under the Land Use Petition Act (LUPA),[5] seeking reversal of the development's increased density. North Pacific also appealed, seeking reversal of the Hearing Examiner's open space ruling and recalculation requirement. Hunt Skansie Land, LLC,[6] which owned Skansie Park, joined North Pacific as a respondent/petitioner.

¶12 After consolidating the issues on appeal, the superior court ruled in favor of North Pacific and Hunt Skansie Land, LLC, on both issues, affirming the Hearing Examiner's interpretation of the municipal code on the density issue and reversing the Hearing Examiner's decision on the issue of open space.

## D. City's Appeal to Court of Appeals

¶13 The City filed a notice of direct appeal, seeking de novo review of the Hearing Examiner's decision. Intervenor, Bennett Development, Inc., joined North Pacific, concurring with North Pacific's arguments in its briefing.[7]

---

[5] Ch 36.70C RCW.

[6] Hunt Skansie is no known relation to Judge J. Robin Hunt, author of this opinion.

[7] Bennett was also a party in the City's LUPA appeal to Pierce County Superior Court. The record contains no information, however, about Bennett's relationship to North Pacific or to Hunt Skansie Land, LLC. A copy of the intervenor's joinder brief is bound with the unpaginated Clerk's Papers, in which Bennett expressly concurs with the arguments set forth under the respondent's brief.

## ANALYSIS

¶14 The City argues that North Pacific cannot (1) use a PRD to build at an increased density because it conflicts with the underlying RB-2 zone and (2) count perimeter setback areas toward the required PRD 30 percent "open space" calculation. These arguments fail.

### I. STANDARD OF REVIEW

¶15 In interpreting a municipal ordinance, statutory construction is a question of law, which we review de novo under the error of law standard. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 175, 4 P.3d 123 (2000). We stand " 'in the same position as the superior court when reviewing an administrative decision' " and look directly to the administrative record. *Boehm v. City of Vancouver*, 111 Wn. App. 711, 716, 47 P.3d 137 (2002) (quoting *Swoboda v. Town of La Corner*, 97 Wn. App. 613, 617, 987 P.2d 103 (1999)).

¶16 In reviewing municipal ordinances, we apply the same rules of construction that we apply to state statutes. *Sandona v. City of Cle Elum*, 37 Wn.2d 831, 836-37, 226 P.2d 889 (1951).

¶17 We construe zoning ordinances as a whole and reject any unreasonable construction. *See Bartz v. Bd. of Adjustment*, 80 Wn.2d 209, 218, 492 P.2d 1374 (1972). Our primary purpose in interpreting a zoning ordinance is to ascertain the legislative intent. *East v. King County*, 22 Wn. App. 247, 253, 589 P.2d 805 (1978). If the language is unambiguous, we rely solely on the statutory language. *State v. Roggenkamp*, 153 Wn.2d 614, 621, 106 P.3d 196 (2005). When a statute or ordinance is unambiguous, construction is unnecessary because the plain meaning controls. *McTavish v. City of Bellevue*, 89 Wn. App. 561, 565, 949 P.2d 837 (1998).

## II. Density Increase

¶18 The City argues that (1) the legal effect of approving a PRD actually created a rezone of the RB-2 zoning district, even if the PRD involved no change in use, because the PRD regulations departed from the underlying RB-2 zoning laws; (2) due to North Pacific's choice to develop its property as a PRD, it had to conform to the PRD standards, rather than the underlying RB-2 standards, given that the PRD was a zoning scheme separate from the underlying RB-2 zoning district; and (3) the Hearing Examiner erred by allowing North Pacific to "pick and choose" between density schemes to get the most intensive use of the property without providing the required offset in public amenities. We disagree.

¶19 North Pacific counters that (1) the PRD did not create a rezone; (2) the City failed to provide any Washington case law to support its argument that North Pacific engaged in inappropriate "mixing and matching" of the municipal code provisions; and (3) the Hearing Examiner properly harmonized the PRD and the RB-2 zoning provisions. We agree with North Pacific.

### A. Applicable City Code Provisions

¶20 The City's underlying RB-2 zone allowed the following maximum densities: "Eight dwelling units per acre permitted outright; 12 dwelling units per acre allowed as a conditional use." Former GHMC 17.30.050(G) (Ordinance 954, § 3 (2004)).[8] The municipal code specifically permitted the following uses in a PRD: "Those primary, accessory and conditional uses permitted in the underlying zoning district . . . ." Former GHMC 17.89.050(A) (Ordinance 867, § 5 (2001)).

---

[8] Throughout this analysis, we refer to the version of the GHMC that was in effect during North Pacific's application process. The city council has since amended the municipal code.

¶21 In addition to the underlying zoning regulations, developers could use PRD regulations to develop more intensely if their proposals promoted a more efficient and economical use of the land. GHMC chapter 17.89, which contained the PRD regulations, provided, "The intent of the PRD zone is to allow opportunity for more creative and imaginative residential projects than generally possible under strict application of the zoning regulations in order that such projects shall provide substantial additional benefit to the general community." GHMC 17.89.010 (Ordinance 867, § 1 (2001)).

## B. No Rezone

¶22 The City contends that a line of cases, including *Wiggers v. County of Skagit*, stand for the proposition that approving a PRD creates a rezone. 23 Wn. App. 207, 596 P.2d 1345 (1979). But these cases provide no guidance on this point. For example, in *Wiggers*, Division One of our court did not analyze whether a PRD constitutes a rezone; rather the court presumed that the planned unit development (PUD)[9] at issue was a rezone and then determined whether the effect of the property's presumed rezone created a new spot zoning scheme. *Id.* at 215.

¶23 As North Pacific notes, the rezone language in *Wiggers* originated in *Lutz v. City of Longview*, which provides some guidance:

> What is the legal nature and effect of the act of imposing a PUD upon a specific parcel of land? We hold that it is an act of rezoning which must be done by the city council because the council's zoning power comes from the statute and that is what

---

[9] A "planned unit development" is a regulatory technique, like a "planned residential development," that excuses a developer from otherwise applicable zoning regulations in exchange for submitting to detailed, tailored regulations. *Schneider Homes, Inc. v. City of Kent*, 87 Wn. App. 774, 775-76, 942 P.2d 1096 (1997). For purposes of our analysis, there is no qualitative difference between PRD and PUD development techniques. As Division One of our court pointed out in *Schneider Homes*, "[T]he [PUD] technique is characterized by flexibility." *Id.* As the City notes, the PRD technique is used in many jurisdictions under different names, including "planned unit development" and "planned development district."

the statute requires. It is inescapable that application of the PUD to this tract constituted an act of rezoning. Before the PUD was authorized, the tract here was limited to low density single family residences primarily. After authorization of the PUD the permitted use is the erection of two large buildings, one of them 55 feet high, consisting of 28 living units, containing 46,900 square feet. There would be 32 underground parking spaces and 30 on-site spaces. The change in permitted use is obvious.

83 Wn.2d 566, 568-69, 520 P.2d 1374 (1974).

¶24  We agree with North Pacific that *Lutz* is distinguishable from the present case because, unlike the ordinance in *Lutz*, the municipal code here expressly allowed a density increase of up to 12 dwelling units per acre as a conditional use in the underlying zone. Thus, the increased density allowed here did not change the purpose or the effect of the zone's permitted use, let alone constitute an "obvious change" that would warrant a rezone.

¶25  North Pacific further argues that *Lutz* does not apply because the GHMC specifically distinguished between PRD projects that required a rezone and those that did not. Under former GHMC 17.89.050(A), PRDs involving "primary, accessory and conditional uses permitted in the underlying zoning district" did not require a rezone application; whereas former GHMC 17.89.050(B) required developers employing other residential and miscellaneous uses to submit a rezone application. Because North Pacific's development involved "primary, accessory and conditional uses," as outlined under former GHMC 17.89.050(A), it did not need to submit a rezone application.

¶26  The City argues that a PRD would constitute a rezone under any and all circumstances, but it fails to support this proposition. Although the City argues that the effect of the PRD conflicted with the RB-2 zoning regulations, it cannot ignore the fact that a density of up to 12 dwelling units per acre was consistent with both the RB-2 and the PRD requirements. As the Hearing Examiner correctly determined, a PRD under the City's former code

did not create a rezone here because the municipal code expressly permitted densities of up to 12 dwelling units per acre with a conditional use permit.

¶27 In sum, granting a PRD application did not create a rezone because there was no conflict between former GHMC 17.30.050 and former GHMC 17.89.100. North Pacific's proposal was consistent with the RB-2 zoning requirements for obtaining a conditional use permit to increase density. It was also consistent with the PRD provision, which allowed applicants to pursue PRDs for "primary, accessory and conditional uses permitted in the underlying zoning district." Former GHMC 17.89.050(A). We hold that North Pacific's proposed 11.75 per acre density met both the RB-2 *and* the PRD density requirements.

## C. Density Not a "Use" for CUP Purposes

¶28 In an ancillary argument, the City contends that "density" is not a "use" for the purposes of obtaining a conditional use permit and, thus, North Pacific cannot use the phrase "conditional use" to increase Skansie Park's density. Specifically, the City argues that the City's land use matrix lists all of the uses allowed in an RB-2 district, but that this list fails to include "density" as a use. This argument also fails.

¶29 Although the former Municipal Code did not list density as a "use" in the land use matrix, it specifically required applicants to obtain a "conditional use permit" to increase a development's density. Former GHMC 17.30-.050(G) expressly provided that "12 dwelling units per acre [are] allowed as a conditional use." Thus, the City's assertion that density was not a "use" for the purposes of a obtaining a conditional use permit directly contradicts the plain language meaning of the municipal code.

## D. Conflict and Harmonization

¶30 Next, the City argues that the Hearing Examiner erred by allowing North Pacific to increase density as part

of a PRD, in violation of the municipal code and Gig Harbor's comprehensive plan. Specifically, the City argues that the Hearing Examiner erred in harmonizing the RB-2 density provisions under former GHMC 17.30.050(G) with the PRD density provisions under former GHMC 17.89.100.

¶31 But as North Pacific correctly argues, these provisions do not conflict. For the RB-2 zoning regulations, former GHMC 17.30.050(G) permitted a density of up to "12 dwelling units per acre" as a conditional use.[10] For the PRD zoning regulations, former GHMC 17.89.100(A) limited density increases to 30 percent, but only where an applicant sought to increase the density "over that *permitted* in the underlying zone."[11] (Emphasis added.) We agree with

---

[10] The former municipal code provided the following development standards for an RB-2 district:

In an RB-2 district, development standards shall be satisfied for all new and redeveloped uses requiring site plan review:
A. Minimum lot area: 12,000 square feet;
B. Minimum lot width: 70 feet;
C. Front yard setback: 20 feet;
D. Side yard setback: eight feet;
E. Rear yard setback: 15 feet;
F. Any nonresidential yard abutting an existing residential use or zone: 40 feet with dense vegetative screening are not included;
G. *Maximum density: Eight dwelling units per acre permitted outright; 12 dwelling units per acre allowed as a conditional use.*

Former GHMC 17.30.050 (Ordinance 954, § 3 (2004)) (emphasis added).

[11] The former municipal code provided the following standards for a PRD:

A. The density may be increased in a PRD over that permitted in the underlying zone *but only if: (1) consistent with the underlying comprehensive plan designation for the property; and (2) the density increase will not exceed 30 percent over the density allowed in the underlying zone.* Density calculations shall be made as set forth in Chapter 17.05 GHMC.
B. Density Bonuses may be allowed only as follows:
    1. Open Space.
        a. Satisfaction of the standards in GHMC 17.89.110 for open space; and
        b. Provision of open space exceeding by at least 30 percent of the *minimum required by the design review manual of the existing zoning code* (whichever is greater); or at least 30 percent more than the level of service standards for open space and active recreational areas in the capital facilities element of the adopted Gig Harbor comprehensive plan: 10 percent increase.

Former GHMC 17.89.100 (Ordinance 951, § 5 (2004)) (emphasis added).

North Pacific that the City's argument asks us to ignore the plain language of former GHMC 17.30.050(G), which clearly permitted developers to build at a density of up to 12 dwelling units per acre as a conditional use in the underlying RB-2 zone.

¶32 The City also contends that PRD zoning regulations conflicted with Gig Harbor's comprehensive land use plan. Specifically, the City argues that because North Pacific's PRD was inconsistent with the comprehensive plan, the density in a PRD zone could not be increased over the base density allowed in an RB-2 zone. North Pacific counters, however, that the PRD zoning regulations harmonized with the "Goals" of the comprehensive plan, which encouraged higher densities for developments that provide open spaces, retain natural site characteristics, and allow for higher intensity residential improvement.

¶33 For example, Goal 2.3, to "Promote Community Diversity and Distinction and Increase Housing Opportunities," urged developers to "[p]rovide for a range of residential densities which would accommodate the City's 2022 residential growth target of 10,800 within a broad variety of housing types and tenures." City of Gig Harbor Comprehensive Plan Goal 2.3 (2004). North Pacific's use of PRD zoning and its purpose behind this use (to increase density) directly coincided with the Goals of the comprehensive plan, which sought to increase density and to allow for greater flexibility to accommodate Gig Harbor's growing population.

¶34 Moreover, the comprehensive plan's Goals explicitly encouraged developers to build at a density of up to 12 dwelling units per acre. Goal 2.3.4, for example, provided:

a)  Establish a range of residential densities which would accommodate a variety of housing types and tenures. Densities within the city and its urban area should range from a low of 4.0 dwelling units per acre *up to a maximum of 12.0 dwelling units per acre.*

b)  Encourage higher densities (*8-12 units per acre*) for developments which:

1)  Provide substantial open space or buffers [sic] areas within the development;

2)  Have natural site characteristics suitable for higher intensity residential development;

3)  Propose innovative design throughout the project which reflects the historical character of the area;

4)  Have relatively easy access to major local employment areas;

5)  Would not significantly impact established single family residential neighborhoods.

City of Gig Harbor Comprehensive Plan Goal 2.3.4 (emphasis added).

¶35 North Pacific's request to develop its property at a density of just under 12 dwelling units per acre was consistent with the maximum density allowed under both the comprehensive plan and the municipal code. Additionally, North Pacific's proposed development provides perimeter buffers, open space, common parks, public trails, and a natural wetland area. North Pacific also employed an innovative design that would retain the historical character of the site by providing for specific roof pitch and vertical windows. Furthermore, North Pacific intends Skansie Park to serve as a transitional buffer between high intensity commercial areas and lower intensity residential areas, and it seeks to construct a new single family neighborhood where none existed previously. In sum, North Pacific's development proposal not only complied with the City comprehensive plan's requirements, but it also embodied the plan's purpose to accommodate a growing population by increasing the density in residential developments and allowing for greater flexibility in land use density.

¶36 The City's "mix-and-match" zoning argument fails because the RB-2 regulations under former GHMC 17.30.050 and the PRD regulations under former GHMC 17.89.100 simply did not conflict. Both provisions set out consistent methods for regulating density. In the Hearing Examiner's findings, conclusions, and decision, he found no

conflict between the PRD standards and the RB-2 zoning requirements. The Hearing Examiner also decided that the PRD was consistent with the comprehensive plan's Goals to create medium density residential development that incorporates open space amenities and efficient urban use. The Superior Court agreed with the Hearing Examiner's conclusions.

¶37 Additionally, we disagree with the City's assertion that the city council could not foresee enacting PRD regulations in 1989 when it enacted the underlying RB-2 zoning regulations. First, the city council is presumed to know the statutory scheme at the time it decides to amend it.[12] *See Bishop v. City of Spokane*, 142 Wn. App. 165, 171, 173 P.3d 318 (2007). Second, because the PRD ordinance was enacted within one year of the underlying RB-2 ordinance, it is unreasonable to assume that the city council failed to foresee the interplay between these regulations.[13] Furthermore, when the city council enacted PRD regulations under ordinance 573, it had to have been aware that this section would affect the RB-2 zoning because its PRD regulations expressly provide for greater flexibility than would be possible under "strict application of the zoning regulations."[14] GHMC 17.89.010.

¶38 The city council imposed PRD standards to allow for increased flexibility over those otherwise authorized in the underlying zone; but there is no indication that the city council intended for PRD regulations to displace or to supersede the underlying regulations. Instead, it appears

---

[12] Although the City asserts that the city council adopted PRD zoning "much later" than RB-2 zoning, the city council enacted the RB-2 ordinance just nine months before it enacted the PRD ordinance. Former GHMC 17.30.050 (Ordinance 554, § 1 E (1989)); former GHMC 17.89.100 (Ordinance 573, § 2 (1990)).

[13] On April 10, 1989, the city council adopted the RB-2 regulations under ordinance 554 (codified as GHMC 17.30.050). Then, on February 2, 1990, the city council enacted the PRD zoning regulations under ordinance 573 (codified as GHMC 17.89.010).

[14] Former GHMC 17.89.010 provided, "The intent of the PRD zone is to allow opportunity for more creative and imaginative residential projects than generally possible under strict application of the zoning regulations in order that such projects shall provide substantial additional benefit to the general community."

that the city council intended the PRD requirements to serve as supplemental regulations, which developers could follow to depart from rigid zoning requirements and to increase housing options for Gig Harbor's growing population.

¶39 As North Pacific argues, there is no reason to look to legislative intent because the plain language meaning of both provisions is clear and unambiguous. North Pacific correctly asserts that the "fatal flaw" in the City's argument, as recognized by both the Hearing Examiner and the superior court, is that a request to build at a density of 12 units per acre is a request to build at a "permitted" density. Therefore, the PRD provisions about "increasing density" did not apply to North Pacific's permitted density of 11.75 units per acre. Accordingly, North Pacific is correct that the plain language meaning of the municipal code permitted densities of up to 12 dwelling units per acre if approved under a conditional use permit.

¶40 The City's "mix-and-match" argument fails because it misconstrues the plain language of the municipal code and ignores the fact that former GHMC 17.30.050(G) and former GHMC 17.89.100(A) and (B) can be read and applied harmoniously, as indicated under GHMC 17.89.010. Holding that the municipal code's PRD and RB-2 provisions do not conflict, we affirm the superior court's decision to affirm the Hearing Examiner's approval of North Pacific's applications for a PRD, a preliminary plat, and a conditional use permit.

III. OPEN SPACE

██ ██ ¶41 We next address whether North Pacific properly set aside 30 percent of the development site as common open space, as the municipal code requires. North Pacific contends that it properly counted its perimeter setback area toward its open space calculation. The City counters that perimeter setbacks cannot be counted as open space because the municipal code expressly excludes this

area from its 30 percent calculation. The City's argument fails because it relies on the false premise that perimeter setbacks are equivalent to "required yards," which the municipal code specifically excludes from its calculation of open space.

¶42 The City next asks us to affirm the superior court and to reverse the Hearing Examiner's decision that North Pacific must exclude perimeter setback areas and then recalculate its open space percentage.[15] The City argues that the municipal code's definition of "yard" applied to perimeter setbacks, effectively excluding perimeter setback areas from North Pacific's open space calculation. Looking to the former municipal code's definition of "open space," North Pacific counters that the municipal code excluded only required "yards" from this open space calculation and that the perimeter setbacks, standing alone, did not create required "yards" for purposes of exclusion from this calculation. We agree with North Pacific.

### Statutory Interpretation: "Open Space" under the Municipal Code

¶43 Determining whether the definition of "required yards" included "perimeter setbacks" is a matter of statutory, in this case, code provision, interpretation. The former municipal code required North Pacific to designate at least 30 percent of Skansie Park's gross area as open space:

> Common open space shall comprise at least 30 percent of the gross area of the PRD, and shall be used as a recreational, park or environmental amenity for collective enjoyment by occupants of the development. Common open space shall not include public or private streets, driveways, parking areas *or [the] required yards for buildings or structures.*

---

[15] The Hearing Examiner determined that North Pacific's perimeter setbacks were actually required "yards" and, thus, could not count towards the 30-percent open space calculation. Therefore, the Hearing Examiner required North Pacific to revise its development plan to provide a minimum 5.58 acres of open space, not including the 20-foot perimeter setbacks. The superior court reversed this decision, however, concluding that North Pacific properly counted the 20-foot perimeter setback area towards its open space calculation.

Former GHMC 17.89.110(A) (2001) (emphasis added). Thus, for North Pacific's 18.8 acre site, it had to set aside 5.58 acres of open space to satisfy the 30 percent density requirement.

¶44 North Pacific proposed setting aside 5.66 acres of open space, slightly more than the former municipal code's 5.58 acres minimum requirement. North Pacific's open space calculation included the PRD's perimeter setback areas, which the PRD regulations did not exclude from required minimum open space calculations. Although these regulations allowed most setback standards to be modified, they required that structures bordering the PRD's perimeter be set back "in accordance with the front yard setbacks of the underlying zone." GHMC 17.89.060(A)(2). Thus, according to the RB-2 provision under former GHMC 17.30.050(C),[16] structures located on residential lots bordering the PRD's perimeter had to be set back 20 feet from the perimeter buffer's interior boundary line.

¶45 But in reading these provisions, the Hearing Examiner apparently concluded that (1) the 20-foot PRD perimeter setback requirement created new private residential lot yards extending into the perimeter buffer areas[17] and (2) therefore, these private "yards" could not count toward the minimum open space calculation required under former GHMC 17.89.110(A). Based on these conclusions, the Hearing Examiner ordered North Pacific to exclude the perimeter setbacks from its open space calculation and to recalculate its area of open space. Disagreeing with the Hearing Examiner's conclusion that the perimeter setbacks created excludable private "yards," we reverse the Hearing Examiner's order to recalculate the PRD's open space area.

---

[16] The front yard setback required for the underlying RB-2 zone here was 20 feet.

[17] The PRD regulations referred to the "20 foot" distance from the RB-2 "front yard setback" requirement. Former GHMC 17.30.050(C).

"Required yards"

¶46 Under the plain language of the former municipal code, the definition of "required yards" did not include "perimeter setbacks." GHMC 17.04.880.

a. Distinction between "setbacks" and "yards"

¶47 The municipal code specifically distinguishes between "setbacks" and "yards," providing a separate definition for each term. The municipal code defined "building setbacks" as "the distance between the building line and the nearest boundary to the site or lot, measured at right angles to the boundary." GHMC 17.04.720 (Ordinance 573, § 2 (1990)). The municipal code defines "yard" as "a required open space that is on the same lot with the principal use[18] and is unoccupied or unobstructed by any portion of the structure . . . ." GHMC 17.04.880 (Ordinance 573, § 2 (1990)).

¶48 Although the municipal code did not separately define "perimeter setbacks," it required that "structures located on the perimeter of the PRD shall be set back in accordance with the front yard setbacks of the underlying zone." GHMC 17.89.060(A)(2) (Ordinance 867, § 6 (2001)). The underlying zoning regulations for an RB-2 district requires front yard setbacks to extend 20 feet from the property line. Former GHMC 17.30.050(C).

¶49 As North Pacific correctly notes, the municipal code did not limit "setbacks" to only yards or lots. Unlike a "yard," a "setback" could extend from the boundary line of a site or the property line of an individual lot within that site. For instance, here, although the perimeter setbacks in the proposed Skansie Park development appeared to overlap with the perimeter buffer, they did not encroach on the

---

[18] The municipal code provides no definition for "principal use" in its definition section. Ch. 17.04 GHMC.

private residential area contained within the lot lines of the 174 individual lots. Accordingly, we agree with North Pacific that in setting forth the criteria for its open space calculation, the former municipal code excluded only the required "yards" for each of the residential lots bordering the perimeter.[19]

¶50 In addition to providing separate definitions for these terms in chapter 17.04, the municipal code recognizes the distinction between "setbacks" and "yards" in other provisions. For example, former GHMC 17.78.060(A)(1) provided that the "required width of perimeter areas to be landscaped shall be at least the depth of the required yard *or* setback area." (Emphasis added.) Moreover, as the Superior Court ruled, the term "setback" was noticeably missing from the list of excluded areas provided under former GHMC 17.89.110(A).[20] Although this provision specifically excluded "required yards," "streets," and "driveways" from areas that could be included in the required open space calculation, it did not refer to "setbacks," perimeter areas, or buffers, which comprise the 20-foot perimeter setbacks at issue here.

¶51 Discerning the plain language meaning of "perimeter setbacks" and "required yards" from the municipal code provisions as a whole, we conclude that the city council defined and treated these terms as separate and distinct. Finding no ambiguity in the former municipal code's use of these terms, we assume that the city council meant exactly what it said when it specifically included "required yards" in, but omitted "perimeter setbacks" from, its list of areas

---

[19] We also agree with the superior court, which concluded, "The exclusion from the common open space calculation includes only the required yards for each of the perimeter lots, not the required setbacks for the perimeter lots." Verbatim Report of Proceedings (VRP) (Aug. 10, 2007) at 12.

[20] The Superior Court ruled:

What is noticeably missing from this perimeter setback requirement is the term "yard." The underlying RB-2 zone sets forth minimum yard setback requirements for the side yard, the rear yard, and the front yard. However, the PRD merely speaks in terms of the *perimeter*, not the *perimeter yard*.

VRP (Aug. 10, 2007) at 11 (emphasis added).

that could not qualify as "open space." *See Landmark Dev. Inc. v. City of Roy*, 138 Wn.2d 561, 571-72, 980 P.2d 1234 (1999).

### b. Definition of "yard" not applicable to "perimeter setbacks"

¶52 Additionally, North Pacific argues that its proposed "perimeter setback" was not a "required yard" under the former municipal code because it was not part of an individual "lot." We agree.

¶53 The municipal code defines "yard" as "a required open space that is on the same *lot* with the principal use and is unoccupied or unobstructed by any portion of a structure." GHMC 17.04.880 (Ordinance 573, § 2 (1990)) (emphasis added). The municipal code defined "lot" as "an area of land that is described by metes and bounds or recorded plat and is to be used, developed or built upon *as a single unit of land*." GHMC 17.04.450 (Ordinance 573, § 2 (1990)) (emphasis added).

¶54 Here, the dispute over the meaning of "lot" centers on how to define a "single unit of land." Whereas North Pacific interprets a "single unit of land" as applying to each individual lot within the development site, the City (1) urges us to define a "single unit of land" as applying to the development site as a whole and (2) argues that the development's perimeter setback constituted a "yard" because this setback would be on the same lot with the principal residential use. We disagree.

¶55 Under the plain language of the municipal code, North Pacific's Skansie Park development proposed 174 individual building "lots" for single family residences. The city staff report and the Hearing Examiner both recognized and used the term "lot," as defined in the municipal code, repeatedly referring to North Pacific's development site as a "174-*lot* residential preliminary plat." Administrative R. at 1177 (emphasis added). Additionally, as the Superior Court ruled, "[T]he plain language of the [Municipal Code] defines

a yard as that open space on the same lot as the principal use; in this case the residence or house." Verbatim Report of Proceedings (Aug. 10, 2007) at 12. North Pacific correctly asserts that the only "yards" within Skansie Park are those that are included as part of one of the 174 individual lots.

¶56 North Pacific's assertion is consistent with the municipal code, which defines "yard" as "a required open space *that is on the same lot* with the principal use." GHMC 17.04.880 (Ordinance 573, § 2 (1990)). In contrast, the code defines perimeter "setbacks" as an area located on the perimeter of the entire PRD plat. *See* GHMC 17.89.060(A)(2). Thus, each individual lot in Skansie Park contains a required "yard," but the development site, as a whole, contains a separate perimeter open space area. *See* GHMC 17.04.800 (defining a "tract" as a "parcel of land in single ownership that has not been subdivided into lots"). As depicted on North Pacific's preliminary plat blueprints, this perimeter area is entirely separate from Skansie Park's individual lots, and it contains no residential structures or obstructions. Unlike yards, perimeter setbacks are separate and distinct from the individual building lots, and the former municipal code's plain language demonstrates that only required yards—not perimeter setbacks—required exclusion from the development's open space calculation.

c. PRD perimeter setbacks do not create yards

¶57 Lastly, North Pacific argues that its PRD scheme did not create "yards" in conflict with the underlying zoning regulations. The PRD chapter provides that "[s]tructures located on the perimeter of the PRD shall be set back in accordance with the front yard setbacks of the underlying zone." GHMC 17.89.060(A)(2). The Hearing Examiner apparently mistook this provision to equate "setbacks," regulated under GHMC 17.89.060, with "required yards," regulated under former GHMC 17.30.050. *See* former GHMC 17.89.110(A). Consequently, the Hearing Examiner erroneously concluded that the perimeter setbacks could not be included in the open space calculation for the project.

¶58 As we have previously noted, the former municipal code separately defined the terms "setbacks" and "yards." GHMC 17.89.060 referred to the "underlying zone" solely to establish the distance for perimeter setbacks—not to create a new "yard" that would conflict with the underlying zone's requirements. There is no dispute that all of North Pacific's development's structures are set back at least 20 feet from the development site's outer perimeter. Yet, the Hearing Examiner improperly concluded that North Pacific needed to recalculate its open space to exclude the 20-foot yards areas around the site's perimeter.

¶59 Because the former municipal code provided separate definitions for both "yard" and "setback," we must give effect to both terms. *See City of Seattle v. Williams*, 128 Wn.2d 341, 349, 908 P.2d 359 (1995). The Hearing Examiner failed to do this, however, when he ignored the municipal code's plain language meaning and, instead, used these terms interchangeably. This failure is an error of law, which requires our reversal. Accordingly, we hold that under the former municipal code's plain language, the definition of "yard" did *not* include the site's perimeter setback areas and, thus, North Pacific properly counted these areas toward its 30 percent open space calculation.

¶60 Agreeing with the superior court, we affirm the Hearing Examiner's approval of the CUP's increased density and reverse the Hearing Examiner's order requiring North Pacific to exclude the site's perimeter setback areas and to recalculate its open space.

HOUGHTON and ARMSTRONG, JJ., concur.

Review denied at 166 Wn.2d 1037 (2009).